# United States Tax Court

T.C. Memo. 2026-50

ADRIAN D. SMITH AND NANCY W. SMITH, ET AL.,[1]
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket Nos. 13382-17, 13385-17,      Filed June 16, 2026.
13387-17.

————

*Steven Todd Miller*, *John H. Dies*, *Jeremy M. Fingeret*, and *Jefferson H. Read*, for petitioners.

*Jonathan E. Behrens*, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

WEILER, *Judge*: The principal question in these consolidated cases concerns petitioners' entitlement to credits under section 41[2] for research activities (research credits). Adrian Smith + Gordon Gill Architecture, LLP (AS+GG), reported research credits for research activities related to architectural projects for tax years 2008, 2009, and

---

[1] The following cases are consolidated herewith: Carlisle G. Gill and Wendy S. Gill, Docket No. 13385-17; and Robert J. Forest and Susan N. Gaspari-Forest, Docket No. 13387-17.

[2] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

[*2] 2010 (tax years at issue).[3] These research credits flowed through to AS+GG's three partners, Adrian D. Smith, Carlisle G. Gill, and Robert J. Forest (collectively, Partners). The Partners and their spouses reported the research credits on their joint personal income tax returns. The credits were carried forward and subsequently carried back through amendments to their original joint personal income tax returns. The Internal Revenue Service (IRS or respondent) disallowed the research credits for the tax years at issue.

For purposes of trial the disallowed research credits are limited to those claimed for "6 Sample Projects" performed by AS+GG: Atrium City Tower (Project No. 208021); Kingdom Tower (Project No. 210005); Masdar HQ (Project No. 208004); Atrium City Masterplan (Project No. 207014); Plot 14 (Project No. 206003); and Plot R2 (Project No. 207016) (collectively, Projects).[4] After concessions[5] the issues remaining for decision are whether (1) the research in connection with the Projects was funded research within the meaning of section 41(d)(4)(H) and (2) the 2008 compensation of Messrs. Smith, Gill, and Forest was reasonable under section 174(e).

## FINDINGS OF FACT

Some of the facts are stipulated and are so found. The parties' Stipulations of Facts and the attached Exhibits are incorporated herein by this reference. During the tax years at issue AS+GG was a partnership whose sole partners and owners were Messrs. Smith, Gill,

---

[3] In his original Answer respondent asserted a deficiency in tax for petitioners' 2007 tax year; but pursuant to the Supplemental Stipulation of Settled Issues, this deficiency amount has been waived since respondent did not expressly reserve for trial the issue of research credits generated in tax year 2007.

[4] AS+GG research credits are attributable to 48 projects in total, but the parties stipulated that the scope of the trial would be limited to the 6 projects.

[5] The parties conceded multiple issues in these cases: (1) AS+GG's claimed business components for the tax years at issue satisfy the four-part test and are qualified under section 41(d); (2) the exclusions under section 41(d)(4)(A)−(G) are inapplicable for the tax years at issue; (3) AS+GG's reported fixed-based percentage under section 41(c)(3) is 3.00% for the tax years at issue; (4) all issues regarding the foreign research exclusion under section 41(d)(4)(F) are resolved; (5) respondent conceded that petitioners are not liable for accuracy-related penalties under section 6662(a) for the tax years at issue; and (6) "all other issues or defenses arising from AS+GG's tax year[s] 2008, 2009, and 2010, which are not expressly settled or reserved for trial herein are resolved in favor of Petitioners" under the Supplemental Stipulation of Settled Issues (Docket No. 13382-17, Doc. 139).

**[*3]** and Forest. Petitioners resided in Illinois when the Petitions were timely filed.[6]

I.  *Background of AS+GG*

Messrs. Smith and Gill cofounded AS+GG, an Illinois limited liability partnership, and entered into an agreement of partnership on November 2, 2006. Mr. Forest was made a partner of AS+GG in December 2006. AS+GG's vision was to work on large-scale, highly innovative, sustainable projects. In 2006 only a handful of architecture firms were designing supertall[7] buildings that were sustainable.

AS+GG's early years were focused on developing architecture designs with net-zero energy,[8] but it transitioned to a focus on net-zero carbon[9] around 2007. The change to net-zero carbon led AS+GG to design buildings that used less energy and generated energy that fed back into power grids. AS+GG is well known in the industry, and it has acquired many of its contracts through winning international design competitions. AS+GG's projects have won various awards such as the International Property Awards for Verde Residences as the Best Green Development and the Middle East Award for Green Project of the Year for Masdar Headquarters.

Most of AS+GG's projects are highly sustainable, complex, large-scale, iconic[10] architectural structures. AS+GG has experience in designing large complex structures, but many of these structures often require a large amount of research. AS+GG's design process did not follow a traditional linear approach but integrated a holistic approach that engaged all elements of the project at the very beginning. Under this method AS+GG did not delegate its work to engineers or other mechanics but instead worked with all aspects of the building project to efficiently design the structure.

---

[6] The parties stipulated that these consolidated cases are appealable to the U.S. Court of Appeals for the Seventh Circuit.

[7] Supertall is anything over approximately 300 meters.

[8] Energy refers to the amount of energy production that a building consumes.

[9] Carbon in this context refers to the life cycle of carbon such as the materiality of the energy and the full lifetime span of a building, not just from the moment it is delivered.

[10] "Iconic" was described as a criterion that clients asked for which was really something they had never seen before.

[*4] In 2008 Messrs. Smith and Gill were the design partners of AS+GG while Mr. Forest was a management partner. Design partners conceptualized what a building would become by creating architectural designs while the management partner assisted in the delivery of the project through technical execution, client management, consultant selection, and fee structure.

II. *AS+GG Partners*

A. *Mr. Smith*

Mr. Smith received his bachelor's degree in architectural design from the University of Illinois, Chicago. While attending university he also worked at Skidmore, Owings & Merrill (SOM), where he worked on designing supertall buildings. At SOM Mr. Smith worked with various partners on large projects where he learned the importance of holistic design and the interconnection between architecture, structure, and mechanical engineering.

Throughout Mr. Smith's career at SOM he worked on a variety of notable projects including the Jin Mao Tower, an 88-story tower in China which at the time it was finished was the tallest building in China; Nanjing Greenland Financial Center, which was a triangular building approximately 458 meters tall; the Pearl Water Tower a zero-energy building, which incorporated wind turbines and photovoltaics;[11] and the Burj Khalifa, which is the world's current tallest structure, standing 828 meters tall. Mr. Smith won various awards for his architectural designs including a total of nine national American Institute of Architects (AIA) awards.[12]

Mr. Smith ultimately decided to start AS+GG because he wanted to establish his own firm, and he believed that his compensation was not reflective of the amount of revenue he was bringing into SOM. At SOM he contributed profits of around $6–$8 million a year but received compensation of $800,000 to $1.3 million. By 2008 Mr. Smith had gained approximately 40 years of experience in practicing architecture.

---

[11] Photovoltaics is the process of generating electrical power from sunlight.

[12] AIA awards are annual awards where architects submit projects for consideration by a jury of their peers.

[*5]   B.   *Mr. Gill*

Mr. Gill has a bachelor's degree in architecture from Ryerson University in Toronto, Canada, a master's degree in architecture from the University of Texas at Arlington, and a master's degree in architecture from Harvard University. Mr. Gill is a licensed architect in Illinois, Indiana, and Ontario, Canada, and he has over 31 years of experience as an architect. He was admitted into the AIA College of Fellows in 2013. He has taught at the Art Institute of Chicago and Harvard University.

Mr. Gill began his career at SOM in 1993 as a C-level architect before advancing to an associate position where he worked on projects such as theatres, parks, the Ravinia Festival renovation, and the Aramco headquarters in Dammam, Saudi Arabia. In 1998 Mr. Gill left to become Director of Design at VOA Associates in the Orlando, Florida, office, where he worked on projects in Latin America and Florida.

In 2000 he returned to SOM as an associate and worked his way up to associate partner before leaving the firm in 2006. Mr. Gill worked with Mr. Smith at SOM on notable projects such as the Nanjing Tower, the Shanghai Grand, and the Pearl River Tower. The Pearl River Tower in Guangzhou, China, is 309 meters tall and the world's first net-zero energy supertall at that time. The Pearl River Tower won architectural design and sustainability awards.

Mr. Gill's projects received many awards, and in 2006 he was named the Best Emerging Architect in Chicago. In addition to awards, he wrote many publications including peer-reviewed articles on sustainability and thermal properties. Mr. Gill left SOM to form AS+GG because he sought greater creative freedom regarding designs.

C.   *Mr. Forest*

Mr. Forest has a bachelor's degree in architecture from Carleton University in Ottawa, Canada. He is a fellow of the AIA and a Leadership in Energy and Environmental Design Accredited Professional, and he sat on the AIA Chicago Board for 12 years along with serving as the chapter president in 2019.

Mr. Forest began his career at MHS Architects—an architecture and engineering firm in Osaka, Japan—before working for RMJM Architecture in Hong Kong, China. In 2001 Mr. Forest joined SOM,

[*6] where he started as a technical architect and advanced to associate partner.

Mr. Forest worked on notable projects at SOM including Burj Khalifa with Mr. Smith and the Nanjing Tower and the Pearl River Tower with Messrs. Smith and Gill. On the Nanjing Tower deal Mr. Forest negotiated the agreement, formulated the execution of the project, and worked with the client and the SOM team to get the project completed.

Mr. Forest worked on projects that received awards including the Middle East Architect Award for Green Project of the Year and the National AIA Honor Award for the Regional and Urban Design Chicago Decarbonization Plan. Mr. Forest left SOM for what he described as the "Dream Team" to work alongside Messrs. Smith and Gill. Although Mr. Forest was on track to become a partner at SOM, he believed that the Partners of AS+GG could work well together and had similar philosophies about architecture, and there was tremendous long-term potential for creative future projects that could be pursued.

III.    *Projects at Issue*

A.    *Atrium City Tower (Project No. 208021)*

AS+GG entered into a consultancy agreement with Meraas Developments, LLC (Meraas), on August 8, 2008 (Atrium City Tower Contract). The Atrium City Tower Contract specified that it would be governed by the laws and regulations of the Emirate of Dubai, United Arab Emirates (U.A.E.).

The Atrium City Tower—also known as 1 Dubai—was designed by AS+GG as three mixed-use towers of approximately 1,000 meters, 800 meters, and 650 meters in height. The Atrium City Tower was situated in the center of the Atrium City District in the Emirate of Dubai. The three towers were interconnected by two lateral structures— first by three triangulated bridges linking all three towers and second by two bridges linking two of the towers. AS+GG considered solar orientation and wind movement as part of the planning process for the design. Further, AS+GG performed a study to evaluate the Atrium City Tower bridges regarding whether the corners of the masses should be articulated or straight up and down, whether it should be solid or cable supported, and whether the tops should be partially open. The Atrium City Tower Contract specifications required that the design would have three of the world's tallest towers, be very energy efficient, and be

**[*7]** designed to high environmental and performance standards. AS+GG was also required to produce deliverables which included proposals for dimensions, materials, utilities, roof plans, and other building information that would be necessary for construction.

The Atrium City Tower Contract provided, within schedule 2, appendix B, that it would be broken down into six phases: the Mobilization Fee,[13] Concept Design, Schematic Design, Design Development, Construction/Tender Documents, and Signing of Construction Contract. Scope of services, schedule 2, section 1.2(e), provided that "[AS+GG] shall report to [Meraas] on its progress in the performance of the Services at such intervals as [Meraas] may reasonably require." The Atrium City Tower Contract required that AS+GG obtain approval from Meraas for each phase, which included a formal presentation before proceeding to the subsequent phases. Approval clauses were stated throughout the Atrium City Tower Contract, such as "[d]evelop the concept design schemes culminating in a concept design approved by [Meraas]," "obtain agreement of the design programme with [Meraas]," and "incorporate as applicable the requirements of [Meraas] and submit to [Meraas] for approval purposes the final version of the Detailed Design Phase documentation."

The Atrium City Tower Contract performance standard for completing the design was provided in section 2.3, Performance:

> Consultant shall perform the services in accordance with sound internationally recognized professional standards and shall exercise skill, care and diligence in the discharge of the duties agreed to be performed by it hereunder which are reasonable to be expected from a competent consultant experienced in carrying out services on projects similar in size and scope as the Project.

Section 6.1, Information, Documents, and Confidentiality, provided:

> (b) In the event that the Employer terminates this Agreement for convenience during the Concept Design phase, the Consultant shall retain the intellectual property and upon payment of the fees related to the Concept Design

---

[13] The mobilization fee is an advance payment before the commencement of services to cover initial investments, such as hiring staff, and provides a cushion in the event that monthly payments are delayed.

[*8]    phase and in addition to the Consultant retaining the mobilization fee, provide an indefinite royalty fee license to the Employer to use unconditionally the intellectual property for the completion of the Project. This Clause is conclusive evidence of the license and no further documentation is required for this purpose.

. . . .

(d) Following any termination beyond the Concept Design phase and upon payment in full for the Phase of Services performed by the Consultant and in addition to the Consultant retaining the mobilization fee, the ownership of the intellectual property will vest automatically with the Employer. The Consultant shall have a limited license to display, present, exhibit and state the design to be the Consultant's work product without obtaining the Employer's written consent. This Clause is conclusive evidence of the license and no further documentation is required for this purpose.

. . . .

(h) It is understood that the Consultant intends to use the work for publication purposes in educational ways to advance the knowledge of the architectural profession, the ability to publish the work for the benefit of the Consultant exposure, enhancement and professional esteem and to present work in public forum/conferences with the consent of the Employer which shall not be unreasonably withheld.

Section 6.2(a), Confidentiality, provided:

The Consultant shall not and shall ensure that its personnel, subcontractors, representatives and agents shall not, without having first obtained on each occasion the express prior written approval of the Employer, issue, disseminate, publish, cause to publish or divulge to any third party, alone or in conjunction with any other person, any information, article, press release, drawing, photograph, illustration or any other publicity relating to this Agreement or the Project generally or use such

[*9]     information for any purpose other than performing the Services.

The total compensation for the Atrium City Tower Contract was a fixed-price lump-sum payment of approximately $298 million. Schedule 3, Remuneration, section 2.1, provided that the "payments [are] to be made monthly based on a percentage complete estimate of services performed." The percentage payments were broken into Concept Design for 10%, which was approximately $29.8 million; Schematic Design for 20%, which was approximately $59.6 million; Design Development for 30%, which was approximately $89.4 million; Construction/Tender Documents for 35%, which was approximately $104.3 million; and Signing of Construction Contract for 5%, which was approximately $14.9 million. In addition, AS+GG was paid a Mobilization fee of $29.8 million prior to the commencement of services. The payments were made 30 days after AS+GG submitted an invoice. "If any item on any such invoice is disputed or subject to question by [Meraas] that shall not entitle [Meraas] to delay payment for the remainder of such invoices."

Schedule 3, section 4.1, provided that for "any Additional Services performed by [AS+GG] not forming part of the Services, [AS+GG] shall receive a fee either on the basis of the aggregate of the scheduled hourly billing rates [in a] method [that] is mutually acceptable and agreed to in writing," and under section 5, Reimbursable Expenses, AS+GG "shall be reimbursed at actual cost on production of accounts/receipts plus 5%."

Meraas could terminate the Atrium City Tower Contract on the basis of material breach, insolvency, and convenience. If there was a termination, the payment under the contract would be "for such part of the Services already performed to the satisfaction of [Meraas] prior to the effect of the termination."

The Atrium City Tower Contract was never completed; therefore, AS+GG and Meraas entered into a Deed of Settlement on December 15, 2009 (Deed of Settlement). The Deed of Settlement stated:

> The remainder scope of the ASGG Services that has not been carried out as at the date of this Deed is to be considered as removed from the scope of ASGG Services that the ASGG was engaged to carry out under said Contracts and such Contracts are as from the Effective

[*10] Date of this Deed mutually agreed by both parties to be cancelled by virtue of this Deed.

. . . .

ASGG retains the copyright in the Projects Documents and hereby grants Meraas a license to market the Projects Documents and Projects on condition that ASGG's name is legibly on all images/models/videos of the Projects wherever they are displayed (E.g.: website, marketing material, poster, etc.) ASGG should be credited as: Designer: Adrian Smith + Gordon Gill the Architecture.

The two parties agreed to final payments, and the Deed of Settlement was governed by the laws of the U.A.E. and of Dubai.

B. *Kingdom Tower (Project No. 210005)*

AS+GG entered into a consultancy agreement with Jeddah Economic Co. (Jeddah) on March 3, 2010 (Kingdom Tower Contract). The Kingdom Tower Contract specified that it was governed by the laws and regulations of the Kingdom of Saudi Arabia.

Jeddah requested that AS+GG design the Kingdom Tower to be the tallest building in the world, over 1,001 meters in height. The Kingdom Tower Contract required additional amenities such as a hotel, apartments, condominiums, commercial office space, retail space, and an observatory. AS+GG determined through wind tunnel testing that the Kingdom Tower design was better suited by rotating the structure 15 degrees to point a corner into the wind and that sloping the structure was better than stepping. The fact that the base of the Kingdom Tower was to be constructed on sand presented significant issues resolved through research regarding load carrying capacity. The Kingdom Tower Contract was broken down into phases: Concept Design, Schematic Design, Marketing Collateral Materials, Detailed Design, Tender and Contract Documentation Phase, and Construction Documentation. The Kingdom Tower Contract required Jeddah's approval of each phase and provided that AS+GG "[c]ommence the [phase] following receipt of [Jeddah]'s approval of the [phase] Design."

The Kingdom Tower Contract's appendix A provided eight pages of the tower site components including height details and dimensions for retail, office space, a hotel, and an apartment. The appendix mentioned that many of the requirements were "recommendations," that "there

**[*11]** [was] flexibility in the treatment of the site within the district and the ultimate shape of the site," and that "[s]hould the architect wish to diverge from the programme indicated above for functional or aesthetic reasons, we are willing to consider modifications." Section 2.3, Performance, provided:

> Consultant shall perform the Services strictly in accordance with sound internationally recognized professional standards and shall exercise all reasonable skill, care and diligence in the discharge of the duties agreed to be performed by it hereunder.

Section 6.1, Information Documents and Confidentiality, provided:

> (b) Provided that the Employer has fulfilled its obligations in respect of remuneration to the Consultant, all information, data, drawings and documents developed or prepared by the Consultant in the performance of the Services shall forthwith become the absolute property of the Employer. The Employer shall be entitled to use or copy (and/or arrange for others to use or copy) such information, data, drawings and documents for the project and for the purposes intended and the Employer need not obtain the Consultant's permission to so use or copy and/or to arrange for others to so use or copy as aforesaid.

> (c) Provided that the Employer had fulfilled its obligations in respect of remuneration to the Consultant, except for standard specifications, details and designs previously used on other projects by the Consultant the copyright in relation to all information, data, drawings and documents developed or prepared by the Consultant in the performance of the Services shall forthwith vest in the Employer and the Consultant shall not use them for any purpose other than for the performance of the Services.

Further, section 6.2, Confidentiality, provided:

> (a) The Consultant shall not and shall ensure that its personnel, subcontractors, representatives and agents shall not, without having first obtained on each occasion the express prior written approval of the Employer:

[*12]     (i) issue, disseminate, publish, cause to publish or divulge to any third party, alone or in conjunction with any other person, any information, article, press release, drawing, photograph, illustration or any other publicity relating to this Agreement or the Project generally or use such information for any purpose other than performing the Services, or

(ii) take or permit to be taken any photograph of the Project, the Project site or any part thereof other than photographs required by the Consultant for record purposes.

(b) The obligations of the Consultant under this Clause 6.2 shall continue indefinitely notwithstanding the expiration or termination of this Agreement.

The total compensation for the architectural design services was a fixed lump-sum payment of approximately $29 million. The fixed lump-sum payment was divided into Concept Design for $2.2 million, Schematic Design for $3.9 million, Marketing Collateral Materials for $175,000, Detailed Design for $11,737,500, Tender and Contract Documentation for $300,000, Technical Reports on Tenders Received for $175,000, Construction Documentation for $10,287,500, and Master Plan & Guidelines for $225,000. Section 6.1, Invoices, provided that the fixed-price lump-sum fee was divided into monthly payments of $1,488,888 for the next 17 months with a final payment one month after.

This payment schedule is dependent on the Consultant maintaining the progress of the Services to the agreed program[] over the period of eighteen (18) months. Should it be found that the progress of the Services is not in line with the agreed program[] then appropriate mutually agreed adjustments to the payment schedule shall be made so that payments reflect the actual progress of the Services achieved.

Section 7.1, Payments, provided that Jeddah would make payments within 30 days of the receipt of an invoice. "If any item on any such invoice is disputed or subject to question by [Jeddah] that shall not entitle [Jeddah] to delay payment for the remainder of such invoices." The Kingdom Tower Contract provided a lump-sum fee for all expenses but allowed additional coverage for any additional trips.

[*13] Jeddah could terminate the Kingdom Tower Contract on the basis of material breach, insolvency, and convenience. Section 10.5, Consequences of Termination, provided that AS+GG had the "right to payment of all remuneration which has accrued due under this agreement up to the date of termination." Further, section 11.1, Payment Upon Default of Consultant, provided that the sum shall be "for such part of the Services already performed to the satisfaction of [Jeddah] prior to the effect of the termination."

Kingdom Tower currently remains under construction.

C.  *Masdar HQ (Project No. 208004)*

AS+GG entered into a consultancy agreement with Abu Dhabi Future Energy Co. PJSC (Abu Dhabi Future Energy or Masdar) on June 23, 2008 (Masdar HQ Contract). The Masdar HQ Contract specified that it was governed by and construed in accordance with the laws of England.

Abu Dhabi Future Energy requested AS+GG to design Masdar HQ for Masdar City, located in Abu Dhabi, U.A.E. The Masdar HQ office site was approximately one million square feet. The design concept included wind cones and a roof canopy that cast a natural shade over the building and surroundings. The Masdar HQ consisted of a ground floor designed as an open space to filter air into shaded areas created by the 50-meter cantilever roof, an upper part of the building which consisted of 6 floors enveloped by an exterior wall, and 11 courtyards formed by cone structures to enhance airflow. The Masdar HQ Contract required zero carbon emissions, minimal energy usage, and innovative designs. Multiple research studies were conducted to complete these building requirements including studies on thermodynamics, geotechnics, fluid dynamics, microclimates, and plant acclimation.

The Masdar HQ Contract was broken into three phases: phase 1, which included Concept Design and Design Development; phase 2, which included Technical Design, Production Information, Tender Documentation, and Tender Action; and phase 3, which included Construction Supervision. At the end of each phase approval by Masdar was required before AS+GG could proceed to the next phase. The approval process required a performance evaluation for phase 1.

> At the completion of Phase 1 there shall be a complete performance evaluation of the systems to review if Project goals are being met. The AS + GG team shall meet with

[*14]  Client and appointed third party reviewers to substantiate the design performance. The Performance evaluation shall form the basis to proceed into Phase 2. Upon Completion of Phase 1 the Client shall review and confirm whether or not AS + GG is to proceed to the Phase 2 scope of work.

The Masdar HQ Contract further provided: "It is understood that Phase 2 services shall only commence upon approval from the Client and the Client has the right not to proceed with AS+GG for Phase 2." The performance standard of care was provided for in section 3.1.

> The Consultant agrees to exercise diligence in the performance of the Services consistent with the agreed upon project schedule, and in accordance with Good Industry Practice. If no time for performance of the Services is specified, the consultant shall perform the Services within a time to be specified by Masdar or, failing that, within a reasonable time

> Section 10, Intellectual Property, provided:

> 10.1 Masdar acknowledges that the Documents are vested, and shall remain vested, in the Consultant or Sub-Consultants as appropriate. Masdar acknowledges that in the course of providing the Services and producing any Documents, the Consultant (and the Sub-Consultants) may use Disclosure, products, materials and methodologies proprietary to Masdar. The Consultant agrees that neither it nor the Sub-Consultants shall acquire any rights in such Disclosure, proprietary, products, materials and methodologies, whether under this Agreement or otherwise.

> 10.2 The Consultant shall, . . . grant (and shall procure that the Sub-Contract grant) a worldwide, irrevocable royalty-free exclusive license(s) to Masdar to copy, use and to reproduce any or all of the Documents for any purpose connected with the Project

> . . . .

> 10.3 The license(s) granted pursuant to Clause 10(2) shall not prevent Consultant publishing articles either about the Consultant or the development of Masdar city

[*15]        . . . .

> 10.4 Notwithstanding the Intellectual Property rights in the Documents remains vested in the Consultant, the Consultant shall not, without prior written consent of Masdar such consent being within the sole discretion of Masdar, be entitled to use the Documents so as to design any building or structure similar in overall design and appearance to Masdar city, nor shall it be entitled to use the Documents for any purpose connected with Masdar city other than for the purpose of this Agreement . .

In the defined terms section of the Masdar HQ, "Contract Documents" means all "drawings, models, plans, elevations, sections, perspectives, specifications, schedules, designs and any other works and documentation produced as part of the services."

The payment was a fixed-price lump sum of $18.7 million. The payment schedule required that "AS+GG shall be paid monthly upon provision of services on the basis of a percentage complete basis." The payment phases included the Mobilization Fee of 10%, Concept of 10%, Design Development of 25%, Technical Design of 25%, and Production Information, Tender Documentation, and Tender Action of 30%. The payment schedule for construction supervision provided that "AS+GG shall be paid monthly, within 30 days of invoicing, according to the schedule of monthly construction supervision rates . . . . AS+GG shall be entitled to stop work should payment not be made by the Client according to the Payment Schedule." The Masdar HQ Contract also provided that various reimbursable expenses were to be given to AS+GG along with additional compensation for any additional services required.

Masdar could terminate the Masdar HQ Contract under section 12, Termination, on a 14-day written notice for breach of any term or condition and if AS+GG were to enter into liquidation. If there was a termination, under section 12.3 "Masdar shall pay [AS+GG] the proportion of the price payable for the Services as relates to the work properly and satisfactorily carried out or where the Services are charged on a time basis, for the time properly and necessarily spent on the Services prior to the termination."

The Masdar HQ was never completed. Masdar and AS+GG entered into a Settlement Agreement on May 24, 2011 (Masdar Settlement Agreement). The parties agreed to a settlement amount to

**[*16]** satisfy the payment obligations of the Masdar HQ Contract. The Masdar Settlement Agreement "acknowledge[d] Masdar's perpetual license and right to use the Intellectual Property pursuant to Clause 10.2 of the Consultancy Agreement." Further, the Masdar Settlement Agreement determined that "[f]or the avoidance of doubt, the [original contract] remains in full force and effect subject to the terms of this Settlement Agreement and any amendments or variations to the [original contract]."

D.    *Atrium City Masterplan (Project No. 207014)*

AS+GG entered into a consultancy agreement with Meraas on December 23, 2007 (Atrium City Masterplan Contract). The Atrium City Masterplan Contract specified that it would be governed by the laws and regulations of the Emirate of Dubai.

The Atrium City Masterplan was in the Emirate of Dubai. The Atrium City Masterplan Contract required retail, residential areas, an office, a hotel, transit, and a water taxi station. It also required that it would be built in a tremendously positive and sustainable manner. Meraas requested four major towers in the area and that two of the towers be designed over 470 meters in height to complement the Burj Khalifa. The total land area was approximately 5.82 million square feet.

The Atrium City Masterplan Contract was broken into three stages. At the end of each stage there was a "Presentation and Client Review & approval of Stage [number]." Section 1.5 provided that AS+GG "shall not proceed with any 'successor' stage before [Meraas] has approved the deliverables of the relevant 'predecessor' stage." However, AS+GG "will not be required to submit a Performance Guarantee."

The Atrium City Masterplan Contract section for copyright provided:

> AS+GG shall retain the copyright of their work and upon payment of all fees when due shall grant the Client a license to reproduce the work in connection with the completion of the Project subject to the following conditions. Should AS+GG's services not proceed past Concept Design or should the client hire another architect to complete the Project past Concept Design AS+GG shall retain the ownership and copyright of all work produced and the Client may not use AS+GG documents for the Project. Once a license is granted to the Client to use the

**[\*17]** documents, the documents shall not be used in connection with any other project by either AS+GG or the Client.

The Atrium City Masterplan Contract had a fixed-price lump-sum fee of $750,000. The payments were to be made at a presentation meeting for each stage, and AS+GG was required to submit an invoice at least seven days before the meetings. The payment schedule included a Mobilization Fee of 20% for $150,000, stage 1 of 26% for $195,000, stage 2 of 27% for $202,500, and stage 3 of 27% for $202,500. The Atrium City Masterplan Contract provided for reimbursable travel expenses, and an "additional services fee [that] shall be a mutually agreeable lump sum or on the basis of the AS+GG hourly billing rates" for any additional services required beyond the contract.

The Atrium City Masterplan Contract provided that "[Meraas] may instruct you to cease work at any time at any stage of the Services; subject only to reimbursement for each completed and approved stage of Services, an agreed percentage complete for any uncompleted stage of Services and reimbursable expenses as defined in the Proposal."

The Atrium City Masterplan was never completed. AS+GG and Meraas entered into a Deed of Settlement on December 15, 2009—the same Deed of Settlement as seen in the Atrium City Tower Contract. AS+GG agreed to withdraw any claims for further payments by Meraas related to the Atrium City Masterplan Contract, and Meraas agreed to release AS+GG from any further obligations. The two parties agreed to final payments.

E.     *Plot 14 (Project No. 206003)*

AS+GG entered into a consultancy agreement with Emaar Properties PJSC (Emaar Properties) in June 2007 (Plot 14 Contract). The Plot 14 Contract specified that it would be governed by the laws and regulations of the Emirate of Dubai.

The objective for Plot 14 was to create unique architecture that reflected modern Islamic architecture and took advantage of its prime location—which is opposite the Burj Khalifa. Emaar Properties wanted a mixed-use tower that was inspired by the Rockefeller Center in New York City. Plot 14 was located in the Burj District in Dubai, which included the Burj Khalifa and the Dubai Mall. The Plot 14 design was centered around a large lake and an island park which were tied together by a boulevard that circled the development. It included a mix of offices, residential plots, and luxury hotels.

**[*18]** The Plot 14 Contract required deliverables that included a main tower with two lower level towers, a plaza, elements of Islamic character, a site that took advantage of its location, integrated facilities, and vehicle access. The Plot 14 Contract required specific dimensions for the residential areas and provided that the design satisfy certain styles including an "architectural statement of quality & stature that embodies a luxury destination," "[a]ttention to detail, using durable and easy to maintain materials is essential," a main lobby that is "[r]ichly yet decorated to reflect the characteristics of a 5-star hotel," and an interior mood that "[s]hould match the architectural style." AS+GG conducted research to design a tower that employed solar diagrams to optimize sunshades and facade treatments tailored to different zones for optimal solar heat control.

The Plot 14 Contract was divided into six phases: Preliminary Study; Concept Design; Schematic Design; Detailed Design; Tender, Contract, and Construction Documentation; and Technical Reports on Tenders Received. At the end of each phase AS+GG had to submit the deliverables for approval by Emaar Properties. The subsequent phase could not be commenced until "receipt of [Emaar Properties'] approval." The performance standard in section 2.3 provided that "[AS+GG] shall perform the Services strictly in accordance with sound internationally recognized professional standards and shall exercise reasonable skill, care and diligence in the discharge of the duties agreed to be performed by it hereunder."

The Plot 14 Contract section 6.1, Information, Documents and Confidentiality, provided:

> (b) All information, data, drawings and documents developed or prepared by the Consultant in the performance of the Services shall forthwith become the absolute property of the Employer. The Employer shall be entitled to use or copy (and/or arrange for others to use or copy) such information, data, drawings and documents for the Project and for the purpose for which they are intended and the Employer need not obtain the Consultant's permission to so use or copy and/or to arrange for others to so use or copy as aforesaid.

> (c) Except for standard specifications, details and designs previously used on other projects by the Consultant the copyright in relation to all information, data, drawings and

**[*19]** documents developed or prepared by the Consultant in the performance of the Services shall forthwith vest in the Employer and the Consultant shall not use them for any purpose other than for the performance of the Services.

Further, section 6.2, Confidentiality, provided:

(a) The Consultant shall not and shall ensure that its personnel, subcontractors, representatives and agents shall not, without having first obtained on each occasion the express prior written approval of the Employer:—

(i) issue, disseminate, publish, cause to publish or divulge to any third party, alone or in conjunction with any other person, any information, article, press release, drawing, photograph, illustration or any other publicity relating to this Agreement or the Project generally or use such information for any purpose other than performing the Services, or

(ii) take or permit to be taken any photographs of the Project, the Project site or any part thereof other than photographs required by the Consultant for record purposes.

(b) The obligations of the Consultant under this Clause 6.2 shall continue indefinitely notwithstanding the expiration or termination of this Agreement.

The Plot 14 Contract was a fixed lump-sum payment of $10.23 million. The payment was broken into Preliminary Study for $306,900; Concept Design for $716,100; Schematic Design for $3,580,500; Detailed Design for $4,910,400; Tender, Contract, and Construction Documentation for $511,500, and Technical Reports on Tenders Received for $204,600. Section 8.1, Payment, provided that Emaar Properties was required to make payments within 30 days of receipt of an invoice. Further, "[i]f any item on any such invoice is disputed or subject to question by [Emaar Properties], this shall not entitle [Emaar Properties] to delay payment or remainder of such invoices."

Section 4, Reimbursable Expenses, provided that Emaar Properties would reimburse AS+GG for any reasonably incurred expenses. If AS+GG had to work overtime or on public holidays, Emaar Properties agreed to pay additional reasonable compensation.

[*20] Emaar Properties could terminate the Plot 14 Contract on the basis of material breach, insolvency, and convenience. If there was such a termination section 11.1 provided that AS+GG was entitled to payment only for "part of the Services already performed to the satisfaction of [Emaar Properties] prior to the effect of the termination."

The Plot 14 Contract was not fully completed, and in June 2009 Emaar Properties and AS+GG exchanged emails to propose a final settlement. On October 10, 2010, AS+GG sent an official letter to confirm acceptance of the Plot 14 final settlement for an agreed-upon amount and discharge from any further work.

F.    *Plot R2 (Project No. 207016)*

AS+GG entered into a consultancy agreement with ETA Star Property Developers LLC (ETA Star Property) in December 2007 (Plot R2 Contract). The Plot R2 Contract specified that it would be governed by the laws and regulations of the Emirate of Dubai.

The Plot R2 was a 40-story residential tower designed as a high-performance, sustainable building that included residential and retail development. The total construction area was 1,340,442 square feet, and it was located within Dubai Maritime City Development in Dubai. The Plot R2 Contract schedule 1, Project Details, and schedule 2, Scope of Services, within approximately ten pages provided that AS+GG was to produce design deliverables for the 40-story residential tower that included a basement with above-grade parking levels, retail, health clubs, office spaces, and a residential area with a specified number of bedroom units. AS+GG conducted research studies regarding implementing wind turbines into the tower to generate energy and reduce the building's energy demand.

The Plot R2 Contract was broken into five phases: Concept Design; Schematic Design; Design Development; Construction Documents; and Tender, Contract, and Award. Each phase required approval by ETA Star Property before AS+GG could proceed to the next phase. Section 2.3, Performance, provided that "[t]he Consultant shall perform the Services in accordance with sound internationally recognized professional standards and shall exercise reasonable skill, care and diligence in the discharge of the duties agreed to be performed by it hereunder."

The Plot R2 Contract section 6.1, Information, Documents and Confidentiality, provided:

**[*21]** (b) The consultant shall retain the copyright of their work and upon payment of all fees when due shall grant the Employer a license to reproduce the work in connection with the completion of the Project subject to the following conditions. Should the Consultant's services not proceed past Concept Design or should the Employer hire another architect to complete the Project past Concept Design the consultant shall retain the ownership and copyright of all work produced and the Employer may not use documents for the Project. Once a license is granted to the Client to use the documents, the documents shall not be used in connection with any other project by either the Consultant or the Client.

The Plot R2 Contract was a fixed-price lump sum of $7.5 million, which consisted of precontract services of $5.625 million and Construction Supervision of $1.875 million. In addition, AS+GG was paid a Mobilization fee of $750,000 prior to the commencement of services. The precontract services were broken into Concept Design of 10% for $562,500; Schematic Design of 15% for $843,750; Design Development of 27.5% for $1,546,875; Construction Documents of 45% for $2,531,250; and Tender, Contract, and Award of 2.5% for $140,625. Schedule 4, section 8.1, Payments, provided that AS+GG was to submit an invoice to ETA Star Property and within 30 days of receipt of the invoice, a payment would be made. "If any item on any such invoice is disputed or subject to question by [ETA Star Property], this shall not entitle [ETA Star Property] to delay payment or remainder of such invoices."

Reimbursable Expenses, section 4, provided that AS+GG would be reimbursed for reasonably incurred expenses such as travel, business visits, and translation of documents into other languages. If AS+GG was required to work overtime or on public holidays, the Plot R2 Contract provided that ETA Star Property "shall pay to [AS+GG] reasonable additional remuneration in relation thereto as agreed between the parties or according to Dubai Law."

ETA Star Property could terminate the Plot R2 Contract on the basis of material breach, insolvency, and convenience. Section 11.1 provided that AS+GG would be entitled to payment for "part of the Services already performed prior to the effect of the termination."

**[\*22]** The Plot R2 Contract was never completed, and a settlement was never reached.

IV.   *Tax Reporting*

AS+GG engaged alliantgroup, LP, to identify and calculate possible research credits under section 41 on the basis of research conducted during tax years 2007 and 2008. AS+GG subsequently engaged Warner Robinson, LLC, to identify and calculate possible research credits under section 41 on the basis of research conducted during tax years 2009 and 2010. AS+GG claimed research credits for research activities pursuant to section 41 for the tax years at issue, and the Partners claimed the research credits attributable to their distributive shares.

AS+GG claimed a research credit on its 2008 Form 1065, U.S. Return of Partnership Income, of $3,134,318. At the time of AS+GG's filing, Mr. Smith owned 60% of AS+GG, Mr. Gill owned 22.5%, and Mr. Forest owned 17.5%. On the basis of the ownership amounts Mr. Smith claimed a research credit of $1,880,592, Mr. Gill claimed a research credit of $705,221, and Mr. Forest claimed a research credit of $548,505. AS+GG's reported average annual gross receipts—as defined in section 41(c)(1)(B)—for tax year 2008 were $2,403,450. In 2008 AS+GG deducted guaranteed payments to Messrs. Smith, Gill, and Forest in the respective amounts of $970,126, $855,994, and $788,621.

AS+GG's total taxable Ordinary Business Income (OBI) for 2008 was $56,976,935. The Partners were issued individual Schedules K–1, Partner's Share of Income, Deductions, Credits, etc., for the 2008 tax year which reported their shares of OBI.

The 2008 gross salaries originally reported for Messrs. Smith, Gill, and Forest were the respective amounts of $30,249,440, $11,799,698, and $9,286,873. AS+GG originally claimed wage-related qualified research expenditures (Wage QREs) for tax year 2008 attributable to Messrs. Smith, Gill, and Forest for $16,231,850, $5,883,329, and $2,574,321, respectively. The parties stipulated in advance of trial that Messrs. Smith, Gill, and Forest devoted 53.66%,

[*23] 45%,[14] and 27.72%, respectively, of their time to qualified services during tax year 2008.[15]

AS+GG claimed a research credit on its Form 6765, Credit for Increasing Research Activities, attached to the 2009 Form 1065, of $557,455. At the time of AS+GG's filing, Mr. Smith owned 60% of AS+GG, Mr. Gill owned 22.5%, and Mr. Forest owned 17.5%. On the basis of the ownership amounts Mr. Smith claimed a research credit of $334,474, Mr. Gill claimed a research credit of $125,427, and Mr. Forest claimed a research credit of $97,554. AS+GG's reported average annual gross receipts—as defined in section 41(c)(1)(B)—for tax year 2009 were $39,127,389.

AS+GG claimed a research credit on its 2010 Form 1065 of $515,463. At the time of AS+GG's filing Mr. Smith owned 55% of AS+GG, Mr. Gill owned 25%, and Mr. Forest owned 20%. On the basis of the ownership amounts Mr. Smith claimed a research credit of $283,506, Mr. Gill claimed a research credit of $128,865, and Mr. Forest claimed a research credit of $103,092. AS+GG reported average annual gross receipts—as defined in section 41(c)(1)(B)—for tax year 2010 of $35,705,978.

V.    *Notices of Deficiency and Petitions*

On April 7, 2017, respondent issued to Adrian D. and Nancy W. Smith (collectively, Smiths) a Notice of Deficiency for tax years 2005, 2006, 2008, and 2010 determining deficiencies of $465,169, $150,741, $1,704,075, and $145,057. On April 7, 2017, respondent issued to Carlisle G. and Wendy S. Gill (collectively, Gills) a Notice of Deficiency for tax years 2008 and 2010 determining deficiencies of $643,178 and $40,784. On April 7, 2017, respondent issued to Robert J. Forest and Susan N. Gaspari-Forest (collectively, Forests) a Notice of Deficiency for tax years 2005 through 2008 determining deficiencies of $19,993, $34,577, $33,129, and $515,022.

---

[14] The percentage of time devoted to qualified research services during tax year 2008 was originally 49.86%, but the parties stipulated a reduced amount of time of 45%—which explains the discrepancies in the claimed Wage QREs.

[15] Respondent stipulates total reasonable compensation for tax year 2008 allocable to Messrs. Smith, Gill, and Forest of $2.32 million, $1.807 million, and $1.474 million, respectively.

[*24] Petitioners timely filed independent Petitions with this Court which were consolidated for all purposes on February 28, 2018.

## VI. *Experts*

### A. *Brent M. Longnecker*

Petitioners offered expert witness testimony from Brent M. Longnecker. Mr. Longnecker received a bachelor's degree in business administration and a master's degree in business administration from the University of Houston. He is the chairman and chief executive officer of Longnecker & Associates. He has the following certifications and licenses: (1) Compensation Committee Certification, (2) Certified Compensation Professional, (3) Certified Benefits Professional, (4) Global Remuneration Professional, (5) Certified Executive Compensation Professional, and (6) Compensation Analyst Credential. He was accepted by the Court as an expert in reasonable compensation.

Mr. Longnecker's expert opinion evaluates the incumbent's (or employee) career stage and the relative performance of that employee to determine a specific market percentile using his own proprietary matrix, referred to as the Longnecker Percentile Identification Matrix (LPIM). According to Mr. Longnecker, the intersecting values of these two analyses dictates the market percentile for assessing reasonable compensation of an employee.

Under this approach Mr. Longnecker concluded the individual reasonable compensation for Messrs. Smith, Gill, and Forest for 2008 was approximately $23.6–27.2 million, $11.7 million, and $9.5 million, respectively.

### B. *Joseph J. Ruble*

Respondent offered expert testimony of Joseph J. Ruble. Mr. Ruble received a bachelor's degree in accountancy from the University of Illinois, Urbana-Champaign, and a master's degree in business administration with a concentration in finance from DePaul University. He is the managing director at Caliber Advisors, Inc. Mr. Ruble is a Chartered Financial Analyst and an Accredited Senior Appraiser in Business Valuation from the American Society of Appraisers and is a member of the American Institute of Certified Public Accountants and the Illinois Society of Certified Public Accountants. The Court recognized Mr. Ruble as an expert in reasonable compensation.

**[\*25]** Mr. Ruble used both the independent investor test[16] and the multifactor test[17] to determine the reasonable compensation of the Partners. Mr. Ruble opined that the independent investor test should not be applied under a section 174(e) analysis. However, Mr. Ruble then does apply the independent investor test, and he reversed approximately $3.1 million of expenses related to the tax credit analysis to compute a normalized operating income. Then to account for personal taxes on AS+GG's distributive share of income, he assumed hypothetical distributions were made by AS+GG to cover the tax liabilities of the Partners at the marginal effective tax rate of 36.95%.

After the adjustments Mr. Ruble concluded that the ending adjusted equity balance of AS+GG was $2.16 million. He then determined that the average equity of AS+GG (the average of the beginning and ending equity balances) was $545,000. He concluded that the ratio of the adjusted profit to the average equity balance would result in a return on equity of 939% to the Partners. He concluded on the basis of the mathematical results of the independent investor test that the Partners' compensation, in total, was not unreasonable.

Mr. Ruble also used the multifactor analysis to determine the reasonableness of the compensation claimed by AS+GG. The factors Mr. Ruble considered under the multifactor analysis included: (1) type and extent of services rendered; (2) amount of compensation received by the Partners in previous years; (3) prevailing rates of compensation for comparable positions in comparable concerns; (4) the Partners' qualifications and earning capacity; (5) size and complexities of the business; (6) prevailing general economic conditions; and (7) consistency of AS+GG's salary policy in relation to all employees. Mr. Ruble concluded that on the basis of these factors—given that the Partners spent 100% of their time devoted to developing or supervising the development of architectural designs—the reasonable fair market

---

[16] The independent investor test is "whether an inactive, independent investor would be willing to compensate the employee as he was compensated." *Elliotts, Inc. v. Commissioner*, 716 F.2d 1241, 1245 (9th Cir. 1983), *rev'g* T.C. Memo. 1980-282.

[17] The multifactor test, articulated in *Mayson Mfg. Co. v. Commissioner*, 178 F.2d 115, 119 (6th Cir. 1949), includes weighing the following factors: (1) the employee's qualifications; (2) the nature, extent, and scope of the employee's work; (3) the size and complexities of the business; (4) a comparison of salaries paid with gross income and net income; (5) the prevailing general economic conditions; (6) comparison of salaries with distributions to stockholders; (7) the prevailing rates of compensation for comparable positions in comparable concerns; and (8) the salary policy of the taxpayer as to all employees. *See Suder v. Commissioner*, T.C. Memo. 2014-201, at \*64.

[*26] compensation that could be claimed by Messrs. Smith, Gill, and Forest for 2008 was approximately $2.3 million, $1.807 million, and $1.474 million, respectively.

OPINION

I.    *Jurisdiction and Burden of Proof*

The Commissioner's determination set forth in a Notice of Deficiency is generally presumed correct, and the taxpayer bears the burden of proving that the determination is in error. Rule 142(a)(1); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). "This presumption imposes upon the taxpayer the burden of proving that the [determination] is erroneous." *Pittman v. Commissioner*, 100 F.3d 1308, 1313 (7th Cir. 1996) (quoting *Gold Emporium, Inc. v. Commissioner*, 910 F.2d 1374, 1378 (7th Cir. 1990), *aff'g* T.C. Memo. 1988-559), *aff'g* T.C. Memo. 1995-243. The presumption is not irrebuttable. Presumptions are not recognized when determinations are shown to be "without rational foundation" or "arbitrary and erroneous," but "[a]s long as the procedures used and the evidence relied upon by the government to determine the [determination] had a rational foundation, the inquiry focuses on the merits of the tax liability, not on IRS procedures." *Id.* (quoting *Ruth v. United States*, 823 F.2d 1091, 1094 (7th Cir. 1987)). Therefore, a taxpayer can rebut the presumption of correctness and shift the burden to the Commissioner, but "the taxpayer must demonstrate that the Commissioner's deficiency [determination] lacks a rational foundation or is arbitrary and excessive." *Id.*

Petitioners contend that there is a discrepancy between their tax returns and the Statutory Notices of Deficiency (SNOD). Therefore, petitioners argue that the SNODs should not be afforded any presumption of correctness. However, petitioners offer no evidence that the determinations were without rational foundation, arbitrary, or erroneous.

Petitioners argue that the math in the SNODs is inaccurate on the basis of the tax returns filed and that the SNODs disallow a research credit different from what the parties agreed to in the Stipulations. However, the differences between the SNODs and the tax returns for the originally claimed research credits were based on an undisputed change in accounting methods made during the IRS examination which petitioners are not challenging in these consolidated cases. Accordingly, we do not find there to be a discrepancy between petitioners' returns and

**[\*27]** the SNODs. The difference is attributed to an undisputed adjustment respondent made in audit.

Respondent has presented evidence of a Certificate of Official Record and Form 4340, Certificate of Assessments, Payments, and Other Specified Matters, for each tax year at issue. The taxable income reported for the tax years at issue on Form 4340 matches the taxable income for each of the tax years at issue shown on Form 5278, Statement—Income Tax Changes, attached to the SNODs. The Seventh Circuit held that "Certificates of Assessments and Payments establish the fact of assessment and carry with them a presumption of validity and that the assessments they reflect were properly made." *Hefti v. IRS*, 8 F.3d 1169, 1172 (7th Cir. 1993). Petitioners failed to present evidence to demonstrate that the assessments lack a rational foundation or are arbitrary or erroneous. Accordingly, the SNODs are presumed correct.

Credits are a matter of legislative grace, and taxpayers must demonstrate their entitlement to credits claimed. *See Feigh v. Commissioner*, 152 T.C. 267, 270 (2019) (citing *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992)); *see also United Stationers, Inc. v. United States*, 163 F.3d 440, 443 (7th Cir. 1998). Petitioners have not established that they meet the requirements of section 7491(a) as necessary to shift the burden of proof to respondent on any factual issues. Accordingly, the burden of proof remains with petitioners.

II.    *Funded Research Exclusion*

Section 38 provides taxpayers with a current-year business credit that includes a credit for research expenses as determined under section 41(a). To constitute qualified research, a research activity must satisfy a four-part statutory test. I.R.C. § 41(d)(1). If the research activities corresponding to a particular product as a whole fail to satisfy the four-part test, we may re-apply the test to subsets of the product. *See* Treas. Reg. § 1.41-4(b)(2) (providing the "shrinking-back rule"). Respondent does not contest that AS+GG's research in connection with the Projects satisfies the four tests enumerated under section 41(d)(1). Respondent, rather, contends the Projects are otherwise excluded from qualified research under section 41(d)(4)(H).

Section 41(d)(4)(H) excludes from the definition of qualified research "[a]ny research to the extent funded by any grant, contract, or otherwise by another person (or governmental entity)." Section 41 does not define the term "funded." To determine the extent to which research

**[\*28]** is funded, the Department of the Treasury (Treasury) directs the reader to Treasury Regulation § 1.41-4A(d). *See* Treas. Reg. § 1.41-4(c)(9). This Treasury regulation provides two relevant factors in determining whether research is funded. *See generally* Treas. Reg. § 1.41-4A(d).

First, "[a]mounts payable under any agreement that are contingent on the success of the research and thus considered to be paid for the product or result of the research" are not treated as funded. *See* Treas. Reg. § 1.41-4A(d)(1); *see also Fairchild Indus., Inc. v. United States*, 71 F.3d 868, 870 (Fed. Cir. 1995) (describing exclusion as allocating the credit "to the person that bears the financial risk of failure of the research"). Alternatively, if the taxpayer is paid for the results of the research regardless of its success, then the research is funded. *See* Treas. Reg. § 1.41-4A(d)(1).

Second, research is funded if the taxpayer performing research for another person "retains no substantial rights" in the research. Treas. Reg. § 1.41-4A(d)(2).

> If a taxpayer performing research for another person retains no substantial rights in research under the agreement providing for the research, the research is treated as fully funded for purposes of section 41(d)(4)(H), and no expenses paid or incurred by the taxpayer in performing the research are qualified research expenses. For example, if the taxpayer performs research under an agreement that confers on another person the exclusive right to exploit the results of the research, the taxpayer is not performing qualified research because the research is treated as fully funded under this paragraph (d)(2). Incidental benefits to the taxpayer from performance of the research (for example, increased experience in a field of research) do not constitute substantial rights in the research.

*Id.* The U.S. Court of Appeals for the Federal Circuit has determined that these regulatory elements interact. *See Lockheed Martin Corp. v. United States*, 210 F.3d 1366, 1374–75 (Fed. Cir. 2000).

> If the taxpayer does not have the right to use or exploit the results of the research, its expenditures are not entitled to the tax credit regardless whether there is an agreement

**[\*29]** that the research will be paid for only if successful, and regardless whether the taxpayer receives some "incidental benefit" such as increased experience.

*Id.* To determine whether the Projects were funded, we are to examine the terms of the parties' contractual arrangements. *See Tangel v. Commissioner*, T.C. Memo. 2021-1, at \*11; Treas. Reg. § 1.41-4A(d)(1) ("All agreements (not only research contracts) entered into between the taxpayer performing the research and other persons shall be considered in determining the extent to which the research is funded."); *see also Lockheed Martin*, 210 F.3d at 1376 (stating that application of the exclusion "must be determined by reference to the research agreements").

The Treasury regulation equally requires that the taxpayer retain substantial rights in the research performed. *See* Treas. Reg. § 1.41-4A(d)(3). Treasury Regulation § 1.41-4A(d)(3)(i) provides:

> If a taxpayer performing research for another person retains substantial rights in the research under the agreement providing for the research, the research is funded to the extent of the payments (and fair market value of any property) to which the taxpayer becomes entitled by performing the research. A taxpayer does not retain substantial rights in the research if the taxpayer must pay for the right to use the results of the research. Except as otherwise provided in paragraph (d)(3)(ii) of this section, the taxpayer shall reduce the amount paid or incurred by the taxpayer for the research that would, but for section 41(d)(4)(H), constitute qualified research expenses of the taxpayer by the amount of funding determined under the preceding sentence.

Consequently, if a taxpayer were to retain the right to use the results of the research in carrying on its business but did not satisfy the contingent on success element—namely the agreement calls for the taxpayer to be paid regardless of the outcome of the research—the taxpayer remains eligible to claim a reduced amount of qualified research expenses. *See* Treas. Reg. § 1.41-4A(d)(3)(ii), (6) (ex. 1).

III. *Loper Bright Analysis*

A precise definition of the funded research exclusion, created by Congress in section 41(d)(4)(H), is not found in the Code. Rather, the

**[\*30]** funded research exclusion is detailed in the applicable Treasury regulations. *See* Treas. Reg. § 1.41-4(c)(9) ("Qualified research does not include any research to the extent funded by any grant, contract, or otherwise by another person (or governmental entity). To determine the extent to which research is so funded, § 1.41-4A(d) applies.").

Petitioners argue that under the Supreme Court's landmark decision in *Loper Bright*, Treasury Regulation § 1.41-4A(d) is no longer the single best reading of section 41(d)(4)(H). *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024). Under today's precedent a deferential and permissible interpretation of the statute no longer prevails simply because Treasury offers it to resolve a perceived ambiguity. *See Varian Med. Sys., Inc. & Subs. v. Commissioner*, 163 T.C. 76, 105 (2024) (citing *Loper Bright*, 144 S. Ct. at 2266, 2273).

Petitioners argue that the best reading of section 41(d)(4)(H) and the determination of the meaning of "funded research" should be based on its ordinary meaning found in a dictionary, namely "a sum of money set apart for a specific objective." Petitioners argue that canons of interpretation support this reading of the statute. Petitioners also contend that the regulatory two-element requirements found in Treasury Regulation § 1.41-4A(d) are superfluous, not found in the Code, and therefore invalid. In further support of their statutory interpretation, petitioners contend that this Court should not defer to prior cases relying on Treasury Regulation § 1.41-4A(d) since none of these decisions performed an analysis of the statutory text now required under *Loper Bright*. We disagree with petitioners' statutory argument as the term "funded" does not necessarily require that financial support be a specific sum that is "set apart for a specific objective." For it is likewise easy to conclude that the funded research exclusion is meant more broadly to include any research that has been provided with financial resources or monetary support.[18]

Respondent contends that the single best way to establish the meaning of the term "funded" in section 41(d)(4)(H) is to consider the terms of the agreements between the parties to determine whether payment received is contingent on the success of the research and whether AS+GG retains substantial rights in the research. Further, in response to petitioners' challenge to Treasury Regulation § 1.41-4A(d),

---

[18] Needless to say, petitioners' proposed definition of "funded" is not the only meaning of the word. For instance, in casual conversation one might refer to a spoiled child as someone who is "funded" by his parents, or to a local nonprofit theatre as being "funded" by one or more generous donors.

**[\*31]** respondent cites *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), and its factors weighing in favor of Treasury's reading of the Code and puts forth numerous factors giving rise to the "power to persuade." These factors include how Treasury first proposed the applicable regulations in 1983, in response to congressional concerns, and finalized the Treasury regulations in 1989 which have since provided consistent guidance to taxpayers for some 35 years.

> *Loper Bright*, 144 S. Ct. at 2273, states:
>
> > By [overruling *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)], . . . we do not call into question prior cases that relied on the *Chevron* framework. The holdings of those cases that specific agency actions are lawful . . . are still subject to statutory *stare decisis* despite our change in interpretive methodology.

Thus, prior decisions have directly addressed the applicability of these Treasury regulations. In *Fairchild Industries*, 71 F.3d at 870, the Federal Circuit specifically analyzed a taxpayer's challenge to the "contingent on success" element by looking to congressional intent. It found that Congress's overarching purpose was to "provide an incentive to American industry to invest in research." *Id.* Moreover, it determined that the "regulations implement allocation of the tax credit to the person that bears the financial risk of failure of the research to produce the desired product or result." *Id.*; *see also Geosyntec Consultants, Inc. v. United States*, 776 F.3d 1330, 1335–36 (11th Cir. 2015) ("The regulations allocate the research tax credit to the entity or person that bears 'the financial risk of failure of the research to produce the desired product or result.'" (quoting *Fairchild Indus.*, 71 F.3d at 870)); Staff of J. Comm. on Tax'n, 97th Cong., General Explanation of the Economic Recovery Tax Act of 1981, at 120–21 (J. Comm. Print 1981).

> The taxpayers in *Lockheed Martin Corp. v. United States*, 42 Fed. Cl. 485, 495 (1998), *rev'd*, 210 F.3d 1366 (Fed. Cir. 2000), disputed the source of the substantial rights requirement of section 41 under *Chevron*.[19] Thus, the U.S. Court of Federal Claims under *Lockheed Martin* already addressed the validity of the "substantial rights" requirement:

---

[19] This issue was not raised again on appeal.

**[\*32]** The court concludes that the Secretary's incorporation of a substantial rights inquiry in Treas. Reg. § 1.41-5(d) is a reasonable construction of I.R.C. § 41(d)(4)(H)'s funded exclusion. That is because, as defendant correctly argues, there is a clear connection between payment for research and the allocation of rights to research results. . . . Therefore, the court declines to invalidate Treas. Reg. § 1.41-5(d)'s definition of "funded" research as incorporating a "substantial rights" element.

*Id.*[20] The Federal Circuit has reaffirmed both the contingent on success and the substantial rights requirements.

These regulations imply two scenarios in which the taxpayer's research will be considered "funded" by another person. The first is when the parties agree that payment shall not be contingent on the success of the research. If the taxpayer's research will be paid for by another person whether or not the research succeeds, the research is funded and the expenditures are not entitled to the tax credit. In contrast, if the taxpayer will be paid only if it succeeds in its research for the other party, the taxpayer's research will not be considered funded. *See Fairchild Indus., Inc. v. United States*, 71 F.3d 868, 873 (Fed.Cir.1995). "The statute is designed so that those who will bear the risk of financial loss can include the tax credit in their calculation of investment risk." *Id.* at 874.

The second scenario in which a taxpayer's research can be considered "funded" or "paid for" is when the taxpayer agrees to perform research for another person without retaining "substantial rights" to its research— when the person for whom the research is performed has "the exclusive right to exploit the results of the research" and the taxpayer "must pay for the right to use the results

---

[20] Treasury initially promulgated regulations addressing "qualified research" in 1989. *See* T.D. 8251, 1989-1 C.B. 3. The regulation governing "funded research" originally appeared as Treasury Regulation § 1.41-5(d), which was captioned "Qualified research for taxable years beginning before January 1, 1986." *See* T.D. 8251, 1989-1 C.B. at 9-10. As part of revised regulations issued in 2000, Treasury redesignated Treasury Regulation § 1.41-5 as Treasury Regulation § 1.41-4A. *See* T.D. 8930, 2001-1 C.B. 433, 449. Although Treasury Regulation § 1.41-4A retains its original caption, paragraph (d) thereof is applicable for the tax years at issue.

**[*33]** of the research." *See* Treasury Reg. § 1.41(5)(d)(2) and — (3). If the taxpayer does not have the right to use or exploit the results of the research, its expenditures are not entitled to the tax credit regardless whether there is an agreement that the research will be paid for only if successful, and regardless whether the taxpayer receives some "incidental benefit" such as increased experience. On the other hand, it follows that as long as exclusive rights are not vested in "another person," the taxpayer may retain substantial rights. Treasury Reg. § 1.41-5(d) thus implements the statute's purpose of giving a tax credit only to those taxpayers who themselves take on the financial burden of research and experimentation to develop new techniques, equipment, and products that they can use in their businesses.

*Lockheed Martin*, 210 F.3d at 1374–75 (footnote omitted). In addition to the Federal Circuit, other courts and our own precedent relied on Treasury Regulation § 1.41-4A(d). *See Meyer, Borgman & Johnson, Inc. v. Commissioner*, 100 F.4th 986, 988 (8th Cir. 2024); *United States v. Grigsby*, 86 F.4th 602, 616–17 (5th Cir. 2023); *Geosyntec*, 776 F.3d at 1334–35; *Fairchild Indus.*, 71 F.3d at 869–70; *Betz v. Commissioner*, T.C. Memo. 2023-84, at *101; *Tangel*, T.C. Memo. 2021-1, at *9–10; *Union Carbide Corp. & Subs. v. Commissioner*, T.C. Memo. 2009-50, 97 T.C.M. (CCH) 1207, 1259, *aff'd*, 697 F.3d 104 (2d Cir. 2012); *Gen. Dynamics Corp. & Subs. v. Commissioner*, T.C. Memo. 1996-153, 71 T.C.M. (CCH) 2586, 2588; *Dynetics, Inc. & Subs. v. United States*, 121 Fed. Cl. 492, 498 (2015).

Thus, we find that the holdings in our prior cases and the aforementioned decisions of the Federal Circuit and Federal Claims continue to remain in effect. *See Diversified Grp. Inc. v. Commissioner*, Nos. 17038-18L, et al., 166 T.C., slip op. at 21–22 (2026); *see also, e.g., Garcia Pinach v. Bondi*, 147 F.4th 117, 121, 131–33 (2d Cir. 2025) (analyzing *Loper Bright* and the doctrine of statutory stare decisis and leaving undisturbed the holding of a prior panel opinion).

Moreover, we find respondent's power to persuade argument compelling. In reaching a conclusion on the validity of a regulation we may give "[c]areful attention to the judgment of the Executive Branch." *Loper Bright*, 144 S. Ct. at 2273. For the views of Treasury in this context "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Id.* at 2262

**[\*34]** (quoting *Skidmore*, 323 U.S. at 140). "The weight of such a judgment in a particular case," of course, "depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id.* at 2259 (quoting *Skidmore*, 323 U.S. at 140); *see also Varian Med. Sys.*, 163 T.C. at 106. Congress has delegated authority to Treasury under section 7805(a) to define criteria for Congress's funded research exclusion found in section 41(d)(4)(H). Here, Treasury has exercised that authority and issued longstanding and favorable administrative guidance that offers both clarity and certainty for taxpayers.

Considering the foregoing, we conclude the regulatory requirements found in Treasury Regulation § 1.41-4A(d) used to determine whether research is funded are reasonably related to and otherwise consistent with the intent of section 41(d)(4)(H). Accordingly, we reject petitioners' contention that the Supreme Court's decision in *Loper Bright* undermines the prior decisions that relied on Treasury Regulation § 1.41-4A(d) and their effects as precedent in these cases. Further, we reject petitioners' reading of the phrase "to the extent funded by any grant, contract, or otherwise" found in section 41(d)(4)(H) to mean only "a sum of money set apart for a specific objective" and likewise determine our reading of this phrase would not be as beneficial as the Treasury regulation requirements. In other words, we find no benefit to petitioners' argument, should we be inclined to reject respondent's reading of the Code for our own.

On the basis of the foregoing, we decline to invalidate Treasury Regulation § 1.41-4A(d) and the requirements for determining funded research under section 41(d)(4)(H) incorporating both "contingent on success" and "substantial rights" elements.

IV.    *Funded Research Exclusion Analysis*

    A.    *Whether Payment Was Contingent on the Success of Research*

For a taxpayer to claim a research credit the amounts payable under the agreement must be contingent on the success of the research. *See* Treas. Reg. § 1.41-4A(d)(1).

> The inquiry turns on who bears the research costs upon failure, not on whether the researcher is likely to succeed in performing the project. When payment is contingent on

**[*35]** performance, such as the successful research and development of a new product or process, the researcher bears the risk of failure.

*Fairchild Indus.*, 71 F.3d at 873. We start by looking at the relevant caselaw and its treatment of contractual provisions similar to those at issue here regarding whether a contract is contingent on the success of research.

In *Fairchild Industries*, 71 F.3d at 874, the Federal Circuit held that the qualified research expenses were not funded because payment was contingent on the success of the research. The contract at issue "contained over 1,000 pages of technical specifications that required [the taxpayer] to meet specific design, construction, quality, and performance standards." *Id.* at 870. It also contained a clause that made the taxpayer accept total responsibility for the research and allowed the contractor to reject the work if it was deemed unacceptable. *Id.* at 871. The Federal Circuit determined that the contract was contingent on the success of the research since the taxpayer had no right to payment until it fully succeeded in each phase of the project and payment remained at risk until the research was successfully completed and accepted. *Id.* at 873.

In *Dynetics*, 121 Fed. Cl. at 498–99, Federal Claims analyzed seven contracts with various payment arrangements to determine whether any of the payments for the contracts were contingent on the success of the research. The taxpayers in that case made a number of arguments for contingency on success including (1) a course of dealing argument that the taxpayer was expected to produce a successful result to receive payment from the contracting partner, (2) an inspection clause or a warranty clause that put the taxpayer at risk of not being paid, and (3) the termination clauses in the contracts that put the taxpayer at risk of nonpayment. *Id.* at 499.

Regarding the course of dealing argument, the court ruled in favor of the Commissioner and determined that the course of dealing argument could be considered only if the contracts were ambiguous—which the Court did not find. *Id.* at 500–01.

The court rejected the taxpayer's argument that a contract's inspection clause was similar to the one in *Fairchild Industries*. *Id.* at 504. Federal Claims determined the taxpayer was mistaken in its reading of *Fairchild Industries* as the Federal Circuit's decision was not

**[\*36]** based on the incorporated inspection clause alone, but rather on "the inspection, rejection, and payment clauses incorporated into the contract." *Id.* The court concluded that the taxpayer's inspection clause in *Dynetics* included no wording about "accept[ing] responsibility for producing a product . . . did not include rejection language; nor did it limit payment to work the government accepted." *Id.* at 505.

The court equally rejected the taxpayer's argument that the termination clause put it at risk of nonpayment. *Id.* at 516. Federal Claims stated that "[w]hile it is true that [the taxpayer] would not have the opportunity to earn its full fee, the loss of an opportunity for profit is not the type of financial risk contemplated in the Treasury regulation. *See* Treas. Reg. § 1.41-4A(d)(1)." *Id.*

In *Geosyntec*, 776 F.3d at 1343, the U.S. Court of Appeals for the Eleventh Circuit held that the two contracts at issue in the case were not contingent on the success of the research. First, the Eleventh Circuit rejected the taxpayer's argument that it faced substantial financial risk under capped contracts because its expenses could exceed the ceiling price for each contract. *Id.* at 1339. "Cost-of-performance is not the financial risk with which we are concerned because 'the only issue is whether payment was contingent on the success of the research'—that is, the financial risk of failure." *Id.* (quoting *Fairchild Indus.*, 71 F.3d at 872).

Second, the Eleventh Circuit found that the contracts did not expressly require that payments to the taxpayer be contingent on the success of the research. *Id.* at 1340. Next, the contract required performance "in accordance with the standard of care applicable to like professionals performing comparable services on the type of project contemplated by each of the contracts." *Id.* at 1341. There was "no barometer by which [the taxpayer]'s performance could be considered 'successful,' and there existed no mechanism for evaluation and acceptance or rejection of the delivered design." *Id.* at 1341–42. Lastly, the contracts provided no clear method of rejection as the taxpayer was paid upon submission of monthly invoices. *Id.* at 1342–43. In sum the Eleventh Circuit found that the taxpayer was entitled to payment under both contracts regardless of success. *Id.* at 1343.

Respondent contends that on the basis of the plain wording of the Projects' contracts, payments were not contingent on the success of the research. Petitioners contend that looking at the Projects' contracts, settlement agreements, and foreign law together, the payments were

**[\*37]** contingent on the success of the research. Thus, we will examine the terms of the research agreements of the Projects to determine whether the payments were contingent on the success of the research.

### 1. *Atrium City Tower (Project No. 208021)*

#### a. *Approval Clauses*

Petitioners argue that the research performed was not funded since AS+GG was entitled to progress payments only for each successfully completed milestone approved by Meraas and the approval clause found in the Atrium City Tower Contract is the same contractual payment structure found in the contract discussed in *Fairchild Industries*, 71 F.3d at 870−72. Petitioners specifically cite schedule 2, appendix B of the Atrium City Tower Contract, which provided for approval of each phase at a final meeting as follows: "[d]evelop the concept design schemes culminating in a concept design approved by [Meraas]," "obtain agreement of the design program[] with [Meraas]," and "incorporate as applicable the requirements of [Meraas] and submit to the [Meraas] for approval purposes the final version of the Detailed Design Phase documentation."

We find that petitioners are mistaken as to their reading of *Fairchild Industries*. The Atrium City Tower Contract and the contract in that case are similar in that both had an approval process. However, the contract in *Fairchild Industries* "contained over 1,000 pages of technical specifications that required Fairchild to meet specific design, construction, quality, and performance standards." *Fairchild Indus.*, 71 F.3d at 870. Here, the Atrium City Tower Contract required construction of three of the world's tallest towers, which had to be very energy efficient, designed to high environmental and performance standards, had a general schedule of project details, and required a timeframe of completion. However, these requirements are not similar to the 1,000 pages of technical specifications requiring the taxpayer's research to meet specific approval for design, construction, quality, and performance standards as found in *Fairchild Industries. Id.*

In *Meyer, Borgman & Johnson, Inc. v. Commissioner*, 100 F.4th at 989, the taxpayer was required under the contracts

> to create a design that included all of the items the owner required, complied with all of the pertinent codes and regulations, would result in a structurally sound building without being so over-engineered as to compromise the

**[\*38]** construction budget, and was sufficiently detailed that a contractor could follow it and successfully construct it.

The U.S. Court of Appeals for the Eighth Circuit ruled that the research conducted was funded since the contracts' "provisions lack the specificity of *Fairchild*, where the taxpayer 'had to succeed at each step' of its research to be paid." *Id.* at 990 (quoting *Geosyntec*, 776 F.3d at 1340). The Atrium City Tower Contract is most similar to the contracts examined in *Meyer* as it listed specifications that Meraas required along with overall standards for successful construction; moreover, the Atrium City Tower Contract lacked the specificity found in the *Fairchild Industries* contract. *See Fairchild Indus.*, 71 F.3d at 870.

Second, the Atrium City Tower Contract lacked the clear performance standard required in *Fairchild Industries*, 71 F.3d at 873. In *Geosyntec*, 776 F.3d at 1341–42, the Eleventh Circuit determined that the research was funded when the "[c]ontract provided no barometer by which [the taxpayer]'s performance could be considered 'successful,' and there existed no mechanism for evaluation and acceptance or rejection of the delivered design." Like the contract in *Geosyntec*, the Atrium City Tower Contract did not provide a barometer by which the performance of the phases could be considered successful and the only reference to a performance standard is found in section 2.3, Performance, which required only "sound internationally recognized professional standards . . . which are reasonable to be expected from a competent consultant experienced in carrying out services on projects similar in size and scope." "There is a difference between 'successful performance'— meeting detailed, barometers of success—and 'proper performance'— providing deliverables pursuant to a general professional standard of care and promising work free from negligence, error, or defects." *Meyer, Borgman & Johnson, Inc. v. Commissioner*, 100 F.4th at 989 (quoting *Geosyntec*, 776 F.3d at 1341).

Further, in *Fairchild Industries*, 71 F.3d at 870–71, specific contract terms explicitly accepted responsibility for doing whatever was necessary to produce the project and clear rejection terms within the inspection clause allowed the contractor to reject the inspected work. Here, however, there was no rejection clause based on failure to deliver a "successful" design, and no express terms in the Atrium City Tower Contract stated AS+GG would accept responsibility for producing the product. In sum, the approval clause found in the Atrium City Tower Contract does not show that the research performed by AS+GG was not funded. *See Dynetics*, 121 Fed. Cl. at 504–05 (ruling the research was

**[\*39]** funded when the contract did not direct the taxpayer to accept responsibility for the research or allow the contractor to reject the inspected work).

b.  *Payment Clauses*

Petitioners also argue that AS+GG was not entitled to payment just for performing research but that it was entitled to payment only for providing end results after approval of its work product. Petitioners contend the payment clause under the Atrium City Tower Contract shows the research performed was not funded.

Schedule 3, Remuneration, section 2.1, provides that the "payments [are] to be made monthly based on a percentage complete estimate of services performed." Under section 9, Payment, AS+GG was required to submit invoices for payment, and within 30 days of receipt of the invoice Meraas was obligated to pay the invoice by wire transfer. The Atrium City Tower Contract payment section likewise supports a finding of funded research, given that it merely required an invoice based on the percentage of work complete, and this section did not provide for Meraas's review and approval of each phase before payment was required. *See Geosyntec*, 776 F.3d at 1342 (ruling that research was funded when payment was based on an invoice submission without prior approval of the product).[21]

In *Dynetics*, 121 Fed. Cl. at 506, Federal Claims determined a research contract was funded even though the contractor did not recover additional profit for corrective work but was not precluded from recovering its costs for replacement or correction. Here the Atrium City Tower Contract in schedule 3, section 4.1, provides that for "any Additional Services performed by the Consultant not forming part of the Services, the Consultant shall receive a fee either on the basis of the aggregate of the scheduled hourly billing rates [or by a] method [that] is mutually acceptable and agreed to in writing." And section 5, Reimbursable Expenses, provides that AS+GG "shall be reimbursed at actual cost on production of accounts/receipts plus 5%." These contractual terms found in the Atrium City Tower Contract further

---

[21] Further, the Atrium City Tower Contract provided that "[i]f any item on any such invoice is disputed or subject to question by [Meraas] that shall not entitle [Meraas] to delay payment for the remainder of such invoices." The fact that Meraas could not be excused from paying petitioners if there was a dispute does not support a finding that approval was required before payment.

**[\*40]** support the finding that AS+GG's financial risk was not contingent on the success of its research performed.

### c. *Termination Clause*

Petitioners also contend that the fact that Meraas could terminate the Atrium City Tower Contract on the basis of material breach, insolvency, and convenience supports their claim the research performed was not funded. Petitioners refer to section 11.1 which provides that if there is such a full and final settlement of all claims and expenses, then payment of the sum would be "for such part of the Services already performed to the satisfaction of [Meraas] prior to the effect of the termination." Petitioners argue that AS+GG was entitled to payments only for the milestones actually completed. The taxpayers in *Dynetics*, however, made the same argument as petitioners do here. In response to this argument Federal Claims stated that "[w]hile it is true that Dynetics would not have the opportunity to earn its full fee, the loss of an opportunity for profit is not the type of financial risk contemplated in the Treasury regulation. *See* Treas. Reg. § 1.41-4A(d)(1)." *Dynetics*, 121 Fed. Cl. at 516. Like our sister court, we similarly determine that the loss of opportunity for AS+GG to receive its full fee under the Atrium City Tower Contract is not the type of financial risk considered in the Treasury regulation in establishing whether the research performed was funded.

### d. *Settlement Agreement*

Next, petitioners argue that the Deed of Settlement entered into by AS+GG is not extrinsic evidence but a superseding contract with terms that discharge the duties in the Atrium City Tower Contract. We stated in an Order served on March 7, 2025, that "[w]e generally agree with petitioners and find some of the documents being proposed by petitioners—namely settlement agreements modifying the original terms of a Contract—not as extrinsic evidence covered by our prior Orders." We do not agree, however, that all duties in the Atrium City Tower Contract are discharged, but only insofar as they are inconsistent with the Deed of Settlement. *See Large v. Mobile Tool Int'l, Inc.*, 724 F.3d 766, 772 n.1 (7th Cir. 2013); *Curia v. Nelson*, 587 F.3d 824, 830 (7th Cir. 2009) ("[A]n original contract remains in force only to the extent that it is not modified by the new agreement.").

In reviewing the Deed of Settlement as a modification to the original terms of the Atrium City Tower Contract, we determine the

**[*41]** parties agreed to a settlement amount and to termination of any further contractual arrangements. Petitioners contend that since AS+GG was never fully paid for its work under the contracts, the research performed cannot be considered funded. We disagree. Although there was a final termination of the work, AS+GG received a reasonable settlement payment for the portion of the work that was completed. As mentioned above, although AS+GG is prevented from earning its full fee, "the loss of an opportunity for profit is not the type of financial risk contemplated in the Treasury regulation." *See Dynetics*, 121 Fed. Cl. at 516. In sum, the Deed of Settlement does not support petitioners' claim that the research performed by AS+GG was not funded.

e.     *Foreign Law Application[22]*

We acknowledge that there is an express choice of law clause in section 4.3 of the Atrium City Tower Contract which states that "[t]his Agreement shall be governed by and construed in accordance with the laws and regulations of and from time to time applicable in the Emirate of Dubai." However, we disagree with petitioners' argument that since there is this express clause, we should apply the foreign laws of the Emirate of Dubai to determine whether the Atrium City Tower Contract is funded.

Petitioners rely on our order served January 3, 2025, in *System Technologies, Inc. v. Commissioner*, No. 12211-21 (T.C. May 2, 2025) (Doc. 54). We denied the Commissioner's motion for partial summary judgment because payments were contingent on the success of the research under Indiana state law. The cases here, however, are distinguishable.[23] In *System Technologies*, the Court determined that since the contracts failed to provide an adequate remedy, the contracting

---

[22] By Order served March 7, 2025, we granted petitioners' request for Judicial Notice as to foreign law provisions. Respondent has reasserted his objection pursuant to Rule 146 and requested that the Court reconsider the Order. We decline to reconsider the Order as to the Atrium City Tower Contract.

[23] In this order the Court determined that a choice of law provision for the State of Indiana did override the "freely bargained agreement of the parties" in the original contract (quoting *Bd. of Comm'rs of Cnty. of Jefferson v. Teton Corp.*, 30 N.E.3d 711, 715 (Ind. 2015). The reason, however, was that Indiana law "requires at least minimally adequate remedies to the contracting parties." *Kenworth of Indianapolis, Inc. v. Seventy-Seven Ltd.*, 134 N.E.3d 370, 379 (Ind. 2019). "Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in IC 26-1." Ind. Code § 26-1-2-719(2).

[*42] parties defaulted to Indiana state law, which requires the statutory remedy of a refund of the amounts paid.

Here, however, the terms of foreign laws of the Emirate of Dubai would not override the remedies set forth under the terms of the contract since the contract did in fact provide an adequate remedy. *See generally Curia*, 587 F.3d at 830; *Dynetics*, 121 Fed. Cl. at 514. In other words, there is no need to consider the application of foreign law, since there is no contention by petitioners that AS+GG's and Meraas's remedies are not set forth under the Atrium City Tower Contract. The Emirate of Dubai's is the contracting parties' choice of law; however, we do not agree with petitioners that the foreign law provisions cited otherwise override the express terms of the Atrium City Tower Contract. *See Dynetics*, 121 Fed. Cl. at 514 ("[A]ny determination of risk must be made solely on the 'research agreement' between the parties, with no consideration of any external statute not expressly incorporated in that agreement.").

In conclusion, and after considering all of the relevant contractual terms raised by the parties, we do not find that the Atrium City Tower Contract payments were contingent on the success of the research.

## 2. *Kingdom Tower (Project No. 210005)*

### a. *Approval Clauses*

Similarly to the Atrium City Tower Contract, petitioners argue, the Kingdom Tower Contract was broken into phases, and the description of each phase contained a clause which provided that AS+GG would "[c]ommence the [next phase] following receipt of [Jeddah]'s approval of the [phase] Design." Thus, petitioners contend that since AS+GG was entitled to progress payments for each successfully completed milestone, it is the same contractual payment structure as in the contract in *Fairchild Industries. See Fairchild Indus.*, 71 F.3d at 870–72. Specifically, petitioners highlight appendix A, Statement of Kingdom Tower Requirements, which required eight pages of tower site components such as height, retail, residential, and other various aspects of the towers that needed to be provided for in the deliverables.

Unlike the Atrium City Tower Contract we acknowledge that the Kingdom Tower Contract did have more technical specifications. However, the appendix provides that many of the specifications are "recommendations," that "there is flexibility in the treatment of the site

**[\*43]** within the district and the ultimate shape of the site," and that "[s]hould the architect wish to diverge from the programme indicated above for functional or aesthetic reasons, we are willing to consider modifications." Thus, we likewise find that the Kingdom Tower Contract is distinguishable from the contract in *Fairchild Industries* as the specifications are not the type of clearly detailed specifications that required approval before payment would be made. *See Fairchild Indus.*, 71 F.3d at 870–71.

Even then, the Kingdom Tower Contract lacks the level of performance standard found in an unfunded research contract. *See Geosyntec*, 776 F.3d at 1341–42; *Fairchild Indus.*, 71 F.3d at 870. The required level of performance for the Kingdom Tower Contract is defined in section 2.3, Performance, which states that the performance standards are "in accordance with sound internationally recognized professional standards and . . . exercise skill, care and diligence." This general language of the Kingdom Tower Contract lacks any detailed barometer of success and requires only a general professional standard of care. *See Meyer, Borgman & Johnson, Inc. v. Commissioner*, 100 F.4th at 989–90; *Fairchild Indus.*, 71 F.3d at 870, 873.

Further, unlike those unfunded research contracts that contained specific wording explicitly accepting responsibility for doing whatever was necessary to produce the project and clear rejection terms, the Kingdom Tower Contract lacks such terms. *See Fairchild Indus.*, 71 F.3d at 870–71; *Dynetics*, 121 Fed. Cl. at 504–05.

b.    *Payment Clauses*

Petitioners argue that under the Kingdom Tower Contract AS+GG was not entitled to payments just for performing research but that it was entitled to payment only for providing end results after approval of its work product.

Section 6.1, Invoices, provides that the fixed-price lump-sum fee was broken down into monthly payments of $1,488,888 for 17 months with a final payment one month after. If the services performed under the Kingdom Tower Contract did not align with the payments, "mutually agreed adjustments to the payment schedule shall be made so that payments reflect the actual progress of the Services achieved." Section 7.1, Payments, provides that Jeddah would make payments within 30 days of the receipt of an invoice. There was no mention in the Kingdom Tower Contract Payments section that Jeddah had to review

**[*44]** and approve the phases before payment. The plain wording of the Kingdom Tower Contract provides that payment is based on receipt of an invoice. *See Geosyntec*, 776 F.3d at 1342. Further, section 6.1 provides that Jeddah was not allowed to delay payments for the invoices if there was a dispute. Jeddah's inability to dispute the payments to AS+GG does not support a finding that Jeddah had to approve the work product before payment. *Id.*; *see Fairchild Indus.*, 71 F.3d at 873 ("Fairchild had no right to payment until it fully succeeded in each phase of the project.").

The Kingdom Tower Contract does provide that the lump-sum fee due was considered to be fully inclusive of all expenses. However, the mere financial risk that could come with having additional costs to produce a project is not risk attributable to the failure of research, but rather the general financial risk of doing business, which may exceed the contracted payment. *See Dynetics*, 121 Fed. Cl. at 506; Treas. Reg. § 1.41-4A(d)(1).

### c. *Termination Clause*

Petitioners note that Jeddah was permitted to terminate the Kingdom Tower Contract on the basis of material breach, insolvency, and convenience. However, under section 10.5, Consequences of Termination, AS+GG had the "right to payment of all remuneration which has accrued due under this agreement up to the date of termination." Further, section 11.1, Payment Upon Default of Consultant, provided that if there was a full and final settlement the sum would be "for such part of the Services already performed to the satisfaction of [Jeddah] prior to the effect of the termination." As already stated, "the loss of an opportunity for profit is not the type of financial risk contemplated in the Treasury regulation. *See* Treas. Reg. § 1.41-4A(d)(1)." *Dynetics*, 121 Fed. Cl. at 516.

In conclusion, we do not find that the Kingdom Tower Contract payments were contingent on the success of the research.

### 3. *Masdar HQ (Project No. 208004)*

### a. *Approval Clauses*

Petitioners argue that the Masdar HQ Contract explicitly stated that each phase required a "complete performance evaluation of the systems to review if Project goals are being met" and that the phases "shall only commence upon approval from [Masdar] and [Masdar] has

[*45] the right not to proceed with AS+GG for [the next phase]." Petitioners cite this statement and contend that the Masdar HQ Contract is similar to the contract considered in *Fairchild Industries* and that this research contract was not funded. Further, petitioners contend that they were obligated to develop as part of their design "zero carbon emissions" and "minimal energy usage," which was the standard of performance to determine whether the results were successful.

We acknowledge that the Masdar HQ Contract had an approval process, but we cannot ignore that the contract in *Fairchild Industries*, 71 F.3d at 870, had 1,000 pages of technical specifications that had to be met before approval. Even though the Masdar HQ Contract required "zero carbon emissions" and "minimal energy usage," these provisions lack a level of specificity where "the taxpayer 'had to succeed at each step' of its research to be paid." *Meyer, Borgman & Johnson, Inc. v. Commissioner*, 100 F.4th at 990 (quoting *Geosyntec*, 776 F.3d at 1340).

The Masdar HQ Contract section 3.1 required that AS+GG "exercise diligence in the performance of the services . . . in accordance with Good Industry Practice." Again, this good industry standard of performance is not a standard that establishes a clear barometer of success. *See id.* at 989.

The Masdar HQ Contract also lacked specific wording whereby AS+GG explicitly accepted responsibility, and it lacked clear rejection inspection clause terms which the contract in *Fairchild Industries* contained. *See Fairchild Indus.*, 71 F.3d at 870–71. Thus, we disagree with petitioners' position that the Masdar HQ Contract was similar to the contract in *Fairchild Industries*. *See id.*; *Dynetics*, 121 Fed. Cl. at 504–05.

b.    *Payments Clause*

Petitioners argue that AS+GG was not entitled to any payment for simply conducting research activities as the client sought a final product that met its functional and economic needs. The payment schedule provided that "AS + GG shall be paid monthly upon provision of services on the basis of a percentage complete basis." The payment schedule for construction supervision provided that "AS+GG shall be paid monthly, within 30 days of invoicing, according to the schedule of monthly construction supervision rates. AS+GG shall be entitled to stop work should payment not be made by [Masdar] according to the Payment Schedule." Neither of these payment schedules mentions

**[\*46]** review and approval of the work product before payment. A payment schedule tied to the percentage of services performed is similar to the contracts in *Geosyntec*—which the Eleventh Circuit held were funded contracts. *Geosyntec*, 776 F.3d at 1341−42.

The Masdar HQ Contract also provided for various reimbursable expenses along with compensation to AS+GG for any additional services required. The additional payments for services and the reimbursement costs do not support a finding that the financial risk is attributable to the success of the research. *See Dynetics*, 121 Fed. Cl. at 506.

c.     *Termination Clause*

The Masdar HQ Contract section 12, Termination, provided that Masdar could terminate on a 14-day written notice on the basis of a breach of terms or conditions and if AS+GG were to enter into liquidation. If there was a termination, section 12.3 provided that "Masdar shall pay [AS+GG] the proportion of the price payable for the Services as relates to the work properly and satisfactorily carried out or where the Services are charged on a time basis, for the time properly and necessarily spent on the Services prior to the termination." As previously stated, although AS+GG could lose the opportunity for full payment under the contract, "the loss of an opportunity for profit is not the type of financial risk contemplated in the Treasury regulation. *See* Treas. Reg. § 1.41-4A(d)(1)." *Dynetics*, 121 Fed. Cl. at 516.

d.     *Settlement Agreement*

As under the Deed of Settlement for the Atrium City Tower contract, not all duties under the Masdar HQ Contract were discharged since only contradictory terms of the Masdar Settlement Agreement overrode the original terms of the Masdar HQ Contract.

Under the Masdar Settlement Agreement the parties agreed to a settlement amount due and payable. "For the avoidance of doubt, the [original contract] remains in full force and effect subject to the terms of this Settlement Agreement and any amendments or variations to the [original contract]." Other than the amount due and payable, there were no specific clauses in the Masdar Settlement Agreement that would override the Masdar HQ Contract.

Petitioners argue that AS+GG received partial payment for services performed and waived the right to be paid in full for services rendered. Although there was a final termination of the work, AS+GG

**[\*47]** received a reasonable payment under the Masdar Settlement Agreement for the portion of the work that was completed. As mentioned above, although AS+GG was prevented from earning its full fee, "the loss of an opportunity for profit is not the type of financial risk contemplated in the Treasury regulation." *Dynetics*, 121 Fed. Cl. at 516.

e.     *Foreign Law Application*

As in the Atrium City Tower Contract, we acknowledge that there was an express choice of law clause in section 26.1 of the Masdar HQ Contract, which stated that "[t]his Agreement and the relationship between the Parties shall be governed by, and construed in accordance with, the laws of England." Petitioners again argue that since there is this express clause, we should allow the foreign laws of the United Kingdom (U.K.) to determine whether the contract is funded. We continue to disagree with petitioners.

Petitioners provide no explanation as to how or why U.K. law would apply to the HQ Masdar Contract. Petitioners reference the Sale of Goods Act 1979, Chapter 54 of the United Kingdom Public General Acts from 1979 to define the basic essentials for a contract, the law afforded to a seller and a buyer including a reasonable opportunity to examine goods upon delivery, and the seller's obligation to bear the costs for repair or replacement of goods. Yet it is unclear how petitioners are applying the U.K. sale of goods law to the Masdar HQ Contract given that the contractual terms describe AS+GG's performance as services. Furthermore, petitioners provide no explanation or expert witness testimony on how U.K. law would override the mutually agreed-upon terms of the contract.

Overall, although U.K. law is the choice of law between the parties to the contract, the provisions cited are not incorporated into any terms of the Masdar HQ Contract and thus are irrelevant. *See Dynetics*, 121 Fed. Cl. at 514 ("[A]ny determination of risk must be made solely on the 'research agreement' between the parties, with no consideration of any external statute not expressly incorporated in that agreement.").

In conclusion, and after considering all the relevant contractual terms raised by the parties, we do not find that the Masdar HQ Contract payments were contingent on the success of the research.

**[*48]**     4.     *Atrium City Masterplan (Project No. 207014)*

a.     *Approval Clauses*

Petitioners argue that at the end of each stage for the Atrium City Masterplan Contract there was a "Presentation and Client Review & approval of Stage [number]." Section 1.5 provided that AS+GG "shall not proceed with any 'successor' stage before [Meraas] has approved the deliverables of the relevant 'predecessor' stage." Thus, petitioners contend that since there is approval before payment, the Atrium City Masterplan Contract has the same contractual payment structure as the contract in *Fairchild Industries*. *See Fairchild Indus.*, 71 F.3d at 870−71. We disagree.

There was required approval for each stage, and the stages mention general requirements such as preparing feasibility studies, area calculations, exterior renderings, site/roof plans, and ground floor plans. However, these requirements are not so specific as to render the Atrium City Masterplan Contract comparable to that in *Fairchild Industries*. *See Meyer, Borgman & Johnson, Inc. v. Commissioner*, 100 F.4th at 990 (ruling research is funded when the contract "provisions lack the specificity of *Fairchild*, where the taxpayer 'had to succeed at each step' of its research to be paid" (quoting *Geosyntec*, 776 F.3d at 1340)); *Fairchild Indus.*, 71 F.3d at 870, 873. Further, there was no mention of a review standard that was used during approval of these components. Accordingly, there is no barometer by which the performance of the stages would be deemed successful under the Atrium City Masterplan Contract as it merely required completion of general requirements within a specified period.

In *Fairchild Industries* there was specific wording that explicitly accepted responsibility for the project and clear rejection terms within the inspection clause. *Fairchild Indus.*, 71 F.3d at 870−71. Here, there was no rejection clause based on the failure to deliver a "successful" design and there was no explicit statement in the Atrium City Masterplan Contract that AS+GG would accept responsibility for producing the product. *See Dynetics*, 121 Fed. Cl. at 504–05 (determining the contracts were funded when there was no direct wording of rejection or wording that directed the taxpayer to accept responsibility for producing a product).

**[\*49]**　　　　　b.　　*Payment Clauses*

Petitioners argue that AS+GG was not entitled to payment merely for performing research but that it was entitled to payment only for providing end results after approval of its work product.

The Payment Schedule, however, provided for a lump-sum payment which was broken down by percentage of completion for each stage. "Payments shall be made to [AS+GG] at the presentation meetings . . . . [AS+GG] shall submit an original invoice to [Meraas] at least seven days prior to the meetings in order that a cheque can be raised in time for each meeting." Although there was a general review of the stages, the payment schedule does not mention Meraas's required approval of the stage before the payment and whether Meraas would withhold the amount if approval was not given. *See Geosyntec*, 776 F.3d at 1342.

The Atrium City Masterplan Contract also provided for reimbursable travel expenses beyond the provided coverage of travel. Similarly, any additional service required of AS+GG by Meraas would have an "additional services fee [that] shall be a mutually agreeable lump sum or on the basis of the AS+GG hourly billing rates." The additional payments for services and the reimbursement for additional travel do not support a finding that there was financial risk contingent on the success of the research. *See Dynetics*, 121 Fed. Cl. at 506.

c.　　*Termination Clause*

Petitioners argue that if Meraas terminated the Atrium City Masterplan Contract, AS+GG was entitled to payments only for the work completed. The Atrium City Masterplan Contract provided that "[Meraas] may instruct you to cease work at any time at any stage of the Services; subject only to reimbursement for each completed and approved stage of Services, an agreed percentage complete for any uncompleted stage of Services and reimbursable expenses as defined in the Proposal." As previously discussed as to the Atrium City Tower Contract, "the loss of an opportunity for profit is not the type of financial risk contemplated in the Treasury regulation. *See* Treas. Reg. § 1.41-4A(d)(1)." *Id.* at 516.

d.　　*Settlement Agreement*

The Deed of Settlement entered into for the Atrium City Masterplan is the same Deed of Settlement entered into for the Atrium

**[\*50]** City Tower. Moreover, petitioners make identical arguments for the Atrium City Masterplan Contract. The analysis is already discussed in the Atrium City Tower section. *See supra* Part IV.A.1.d.

### e.     *Foreign Law Application*

The foreign law application is identical to that for the Atrium City Tower. Therefore, the analysis already discussed in the Atrium City Tower section, *see supra* Part IV.A.1.e, will apply here.

In conclusion, and after considering all the relevant contractual terms raised by the parties, we do not find that the Atrium City Masterplan Contract payments were contingent on the success of the research.

### 5.     *Plot 14 (Project No. 206003)*

### a.     *Approval Clauses*

Petitioners argue that since AS+GG was entitled to payments only after approval by Emaar Properties and that the next phase cannot be commenced until "receipt of [Emaar Properties]' approval," the terms provide the same contractual payment structure as found in the contract in *Fairchild Industries. See Fairchild Indus.*, 71 F.3d at 870–71. Petitioners argue that Emaar Properties' review was based on the detailed degree of requirements found in schedules 1 and 2. Petitioners cite schedule 1, Client Design Brief, which provided design criteria that "should be considered for the site," which included concepts that reflected the Rockefeller Center, dimensions of the tower, designs that had Islamic characteristics, facilities, and vehicle access. For the residential areas the schedule provided specific dimensions for the building. But for other areas, such as retail and exterior, the schedule provided general requirements such as "include a component of retail at ground level that interacts with the boulevard," "building exterior is to have an architectural statement of quality & stature that embodies a luxury destination," "[a]ttention to detail, using durable and easy to maintain materials is essential," a main lobby that is "[r]ichly yet decorated to reflect the characteristics of a 5-star hotel," and an interior mood that "[s]hould match the architectural style."

Petitioners are correct that there was an approval process and the schedules did provide detailed requirements as to various heights and dimensions for the residential spaces; however, the schedules are not so technical that there was a clear barometer of success. Specifically,

[*51] schedule 1 had general requirements such as "attention to detail" and "embodies a luxury destination" that were open ended regarding how AS+GG was to complete the project. Accordingly, we find that the requirements in the Plot 14 Contract lack "the specificity of *Fairchild*, where the taxpayer 'had to succeed at each step' of its research to be paid." *Meyer*, *Borgman & Johnson, Inc. v. Commissioner*, 100 F.4th at 990 (quoting *Geosyntec*, 776 F.3d at 1340).

Further, the Plot 14 Contract lacked the specific performance standard found in *Fairchild Industries*. Section 2.3, Performance, provided that the standard of care was "sound internationally recognized professional standards and . . . exercise [of] reasonable skill, care and diligence." The Plot 14 Contract required only a general professional standard of performance. Again "[t]here is a difference between 'successful performance'—meeting detailed, barometers of success—and 'proper performance'—providing deliverables pursuant to a general professional standard of care and promising work free from negligence, error, or defects." *Id.* at 989 (quoting *Geosyntec*, 776 F.3d at 1341).

Furthermore, there was no rejection clause based on the failure to deliver a "successful" design, nor was there explicit wording in the Plot 14 Contract stating AS+GG would accept responsibility for producing the product. *See Fairchild Indus.*, 71 F.3d at 870–71; *Dynetics*, 121 Fed. Cl. at 504–05.

b.     *Payment Clauses*

Petitioners argue that AS+GG was not entitled to payments just for performing research but that it was entitled to payment only for providing end results after approval of its work product.

Section 8.1, Payment, provided that Emaar Properties was required to make payments within 30 days of receipt of an invoice. Further, the same section provided that "[i]f any item on any such invoice is disputed or subject to question by [Emaar Properties], this shall not entitle [Emaar Properties] to delay payment or remainder of such invoices." We find there was no specific approval required before AS+GG would be paid; and even if there was a dispute over the invoice, payment would still be due from Emaar Properties to AS+GG. *See Geosyntec*, 776 F.3d at 1342.

Section 4, Reimbursable Expenses, provided that Emaar Properties agreed to reimburse AS+GG for any reasonably incurred

[*52] expenses. In the event that AS+GG was required to work overtime or on public holidays, the Plot 14 Contract provided that Emaar Properties "shall pay to [AS+GG] reasonable additional working of such overtime." The additional reimbursement for expenses incurred and the additional payments for work do not support a finding that AS+GG's financial risk was contingent on the success of its research. *See Dynetics*, 121 Fed. Cl. at 506.

c.      *Termination Clause*

Petitioners argue that the Plot 14 Contract provided that Emaar Properties could terminate the Plot 14 Contract on the basis of material breach, insolvency, and convenience. If there was such a termination, section 11.1 provided that AS+GG was entitled to payment only for "part of the Services already performed to the satisfaction of [Emaar Properties] prior to the effect of the termination." Petitioners argue that AS+GG was entitled to payments only for the milestones completed and not for the full contract. Although AS+GG was not entitled to the opportunity of earning its full fee, "the loss of an opportunity for profit is not the type of financial risk contemplated in the Treasury regulation. *See* Treas. Reg. § 1.41-4A(d)(1)." *Id.* at 516.

d.      *Settlement Agreement*

As discussed above, we will consider the additional terms in a settlement agreement. Here, however, there was no official settlement agreement, but rather petitioners cite email correspondence with a final settlement amount signed by both parties. In reviewing the settlement email correspondence, we see there were modifications to the original terms of the Plot 14 Contract such as discharging the remaining obligations and a final settlement payment amount.

Petitioners argue that since AS+GG was never fully paid for its work the Plot 14 Contract cannot be considered funded. We disagree. Although there was a final termination of the work, AS+GG received a reasonable payment for the portion of the work that was completed under the settlement email correspondence. As mentioned above, although AS+GG was prevented from earning its full fee, "the loss of an opportunity for profit is not the type of financial risk contemplated in the Treasury regulation." *See id.*

**[*53]**     e.     *Foreign Law Application*

The foreign law application is identical to that for the Atrium City Tower. Therefore, the analysis already discussed in the Atrium City Tower section, *see supra* Part IV.A.1.e, will apply here.

In conclusion, we do not find that the Plot 14 Contract payments were contingent on the success of the research.

6.     *Plot R2 (Project No. 207016)*

a.     *Approval Clauses*

Petitioners argue that each phase of the Plot R2 Contract required approval by ETA Star Property; and since AS+GG was entitled to payments only for each successfully completed and approved stage, the contract contains the same contractual payment structure as the contract in *Fairchild Industries. See Fairchild Indus.*, 71 F.3d at 870–71. Petitioners cite schedules 1 and 2 of the Plot R2 Contract that provided a list of the requested deliverables and components that ETA Star Property wanted the Plot R2 project to contain.

Petitioners are correct that at the end of the phases there was an approval requirement, but we do not find that schedules 1 and 2 offered such a degree of detail as to render it a barometer of success similar to that in *Fairchild Industries. See id.* at 870, 873. Unlike the *Fairchild Industries* contract that had 1,000 pages of detailed specifications, schedules 1 and 2 within 10 pages state the overall goal desired by ETA Star Property in the project design.

Section 2.3, Performance, provided that the standard of performance was "in accordance with sound internationally recognized professional standards and . . . exercise [of] reasonable skill, care and diligence." The Plot R2 Contract required only a general professional standard and lacked the "specificity of *Fairchild*, where the taxpayer 'had to succeed at each step' of its research to be paid." *Meyer, Borgman & Johnson, Inc. v. Commissioner*, 100 F.4th at 990 (quoting *Geosyntec*, 776 F.3d at 1340); *see id.* at 989.

Furthermore, there was no rejection clause based on the failure to deliver a "successful" design, nor were there any explicit terms in the contract stating AS+GG would accept responsibility for producing the services. *See Fairchild Indus.*, 71 F.3d at 870–71; *Dynetics*, 121 Fed. Cl. at 504–05. Thus, we disagree with petitioners and do not find that the

**[*54]** Plot R2 Contract was similar to the contract found in *Fairchild Industries*.

### b.　*Payment Clause*

Petitioners argue that AS+GG was not entitled to payments just for performing research but that it was entitled to payments only for providing end results after approval of its work product.

Schedule 4, section 8.1, Payment, provided that ETA Star Property was required to make payment to AS+GG within 30 days of receipt of an invoice. The payment section did not have a specific approval or rejection requirement for the work product before the payment. Further, the same section stated that "[i]f any item on any such invoice is disputed or subject to question by [ETA Star Property], this shall not entitle [ETA Star Property] to delay payment or remainder of such invoices." After considering this wording we find, much like with the Plot 14 Contract, that there was not an approval requirement that needed to be met before AS+GG would be paid, and even if there was a dispute over the invoice, payment would still be due from ETA Star Property to AS+GG. *See Geosyntec*, 776 F.3d at 1342.

Section 4, Reimbursable Expenses, provided that ETA Star Property agreed to reimburse AS+GG for reasonably incurred expenses such as travel, business visits, and translation of documents into other languages. In the event that AS+GG was required to work overtime or on public holidays, the Plot R2 Contract provided that ETA Star Property "shall pay to [AS+GG] reasonable additional remuneration in relation thereto as agreed between the parties or according to Dubai Law." The additional reimbursement for expenses incurred and the additional payments for work does not support the finding that financial risk was contingent on the success of the research. *See Dynetics*, 121 Fed. Cl. at 506.

### c.　*Termination Clause*

The Plot R2 Contract provided that ETA Star Property could terminate the contract on the basis of material breach, insolvency, and convenience. If there was such a termination, section 11.1 provided that AS+GG was entitled to payment only for "part of the Services already performed prior to the effect of the termination." Although AS+GG was not entitled to the opportunity of earning its full fee, "the loss of an opportunity for profit is not the type of financial risk contemplated in the Treasury regulation. *See* Treas. Reg. § 1.41-4A(d)(1)." *Id.* at 516.

**[\*55]**              d.    *Foreign Law Application*

The foreign law application is identical to that for the Atrium City Tower. Therefore, the analysis already discussed in the Atrium City Tower section, *see supra* Part IV.A.1.e, will apply here.

In conclusion, we do not find that the Plot R2 Contract payments were contingent on the success of the research.

In summary, none of the payments under the six contracts was contingent on the success of the research. However, if a taxpayer were to retain the right to use the results of the research in carrying on his business but he did not satisfy the contingent on success element, the taxpayer would remain eligible to claim a reduced amount of qualified research expenses, as determined under the pro rata allocation. *See* Treas. Reg. § 1.41-4A(d)(3), (6) (ex. 1).

B.    *Whether AS+GG Retained "Substantial Rights" in the Research*

A taxpayer retains no substantial rights in research performed "under an agreement that confers on another person the exclusive right to exploit the results of the research." *Id.* subpara. (2). Similarly, a taxpayer retains no substantial rights in research "if the taxpayer must pay for the right to use the results of the research." *Id.* subpara. (3)(i); *cf. Lockheed Martin*, 210 F.3d at 1375. Finally, "[i]ncidental benefits" to the taxpayer from performing research, such as "increased experience in a field of research," are not substantial rights. Treas. Reg. § 1.41-4A(d)(2). As with other elements of the research credit, petitioners bear the burden of showing that AS+GG retained substantial rights in the results of any research performed under the contracts. *See Dynetics*, 121 Fed. Cl. at 519, 523.

We start by looking to the relevant caselaw and its treatment of contractual provisions similar to those at issue here. In *Tangel*, T.C. Memo. 2021-1, at \*4−5, we reviewed a contract that stated in relevant part:

A. With respect to Articles for which any technical information, written, oral or otherwise, (i) has been supplied to Seller by or on behalf of Buyer; or (ii) Seller has designed at Buyer's expense; or (iii) Seller has designed specifically to meet Buyer-furnished technical requirements (hereinafter designated "Information"),

**[\*56]** Seller, in consideration of Buyer's furnishing of such Information and/or design funding, agrees that it will not use, or assist others in using, such Information, design funding or tooling to develop or sell such Articles (or similar interchangeable or substitute Articles, or parts thereof) to anyone other than Buyer, either as production, spare or repaired Articles, without Buyer's prior written consent. Seller shall not use or disclose such Information except in the performance of Orders for Buyer, and, upon Buyer's request, such Information and all copies thereof shall be returned to Buyer. . . .

   B. Information prepared by Seller specifically in connection with performance of this Order, including original works of authorship created by Seller, are considered "works made for hire" within the meaning of the U.S. Copyright Laws. Buyer shall be deemed the author of such works. If any such work is determined by a court of competent jurisdiction not to be a work made for hire, this Order shall operate as an irrevocable assignment to Buyer of all right, title and interest in and to such work.

We concluded that paragraph A prevented the taxpayers from using the results of the research under the contract for any other purpose unless the customer gave prior written consent. *Id.* at \*12–13. We further concluded that paragraph B vested the customer with the right to any copyrightable materials created in performing the contract. *Id.* at \*13–14. The taxpayers argued in part that the institutional knowledge gained from research was a substantial right; we squarely rejected this contention, characterizing institutional knowledge as a mere incidental benefit from performing research within the meaning of Treasury Regulation § 1.41-4A(d)(2). *Tangel*, T.C. Memo. 2021-1, at \*16. Accordingly, we concluded that the taxpayers had failed to retain substantial rights in research under the contract.

   In *Dynetics*, 121 Fed. Cl. at 518–23, Federal Claims analyzed two separate contracts in consideration of whether substantial rights were retained. The first contract, between the taxpayer and the University of Alabama, Huntsville (University), stated in relevant part:

   All rights, title, and interest in and to inventions or other intellectual property rights conceived or reduced to practice in the course of performance of the work called for

**[*57]** by this Contract are hereby vested in the University. The contractor agrees to promptly disclose to the University, in a format acceptable to the University, any potentially patentable idea or concept conceived or reduced to practice in the course of performance of the work called for by this Contract.

*Id.* at 518. The taxpayer argued that its work under the contract, which involved solving equations and developing simulations, was not patentable and was thus outside the scope of the terms. *Id.* Focusing on the phrase "other intellectual property rights," Federal Claims determined otherwise and found that the contract vested a "broad category of rights" in the University, including both patentable and nonpatentable technology "conceived or reduced to practice in the course of performance." *Id.* at 519. Accordingly, Federal Claims concluded that the taxpayer had not retained substantial rights in the research performed under the contract. *Id.*

The second contract, between the taxpayer and the U.S. Department of Defense (DOD), was subject to a number of standard national security requirements with respect to the taxpayer's use of classified intelligence information. *Id.* at 519–20. Those requirements prohibited the taxpayer from reproducing intelligence materials or releasing intelligence materials to others without authorization and required the return or destruction of all materials generated by the taxpayer as directed upon completion of the contract. *Id.* at 521. The taxpayer made a three-pronged argument to the court, asserting that (1) it retained the right to use generalized "skills and advancements" that it developed in performing the contract; (2) it could use the particular research results for other contracts following authorization from the relevant component of DOD; and (3) a regulation incorporated into the contract provided that it would retain the rights to any patentable invention or discovery conceived or reduced to practice in performing the contract. *Id.* at 521–23.

With respect to the taxpayer's initial argument, Federal Claims characterized any skill or advancement gained as an "incidental benefit" from performing research and thus not a substantial right under Treasury Regulation § 1.41-4A(d)(2). *Dynetics*, 121 Fed. Cl. at 521. With respect to the second argument, the court observed that the taxpayer had not answered "the obvious question of how it could have substantial rights in the results of the research, if it needed the government's 'authorization' to use those results." *Id.* Finally, while the court

**[\*58]** acknowledged that the taxpayer would retain patent rights under the contract, it concluded that such rights would be irrelevant to whether the taxpayer retained substantial rights in the nonpatentable results of its research at issue. *Id.* at 523. Federal Claims thus concluded that the taxpayer retained no substantial rights in the research performed under this contract. *Id.*

In *Lockheed Martin*, 210 F.3d at 1375, the Federal Circuit analyzed each of the taxpayer's arguments on appeal. First, the Federal Circuit determined that "[t]he right to use the research results, even without the exclusive right, is a substantial right." *Id.* On appeal the Government argued that the determination of substantial rights requires reference to external export control laws and top-secret classifications. *Id.* The Federal Circuit rejected the argument that there can be reference to information outside the research agreements. "The regulation's focus on the taxpayer's right under the research agreements makes it clear that the determination whether the taxpayer had the right to use the results of its research without paying for that right must be determined by reference to the research agreements." *Id.* at 1376.

Next, the Government argued that under the "Recovery of Nonrecurring Costs on Commercial Sales" provision the taxpayer was required to reimburse the Government for its nonrecurring, or one-time, costs relating to the research, development, testing, and production of products that the taxpayer wished to sell to third parties. *Id.* at 1377. The Federal Circuit found this wording distinguishable from that of a provision requiring payment for the right to use the research. *Id.* The court said that "requiring payment for the right to use is generally a royalty based on sales of a product, not on cost of its research and development. Such payment is generally a percentage or per item royalty, rather than a cost reimbursement provision such as exists here." *Id.* On the basis of this distinction the Federal Circuit determined the clause does not restrict the taxpayer's use of the items or technology but merely applies when the taxpayer sells items or licenses of related technology. *Id.* Moreover, the court noted how the taxpayer's "right to make the subject products, essentially similar products, or related technology, and to use them in its own business, is not restricted. Even the right to sell is not precluded if reimbursement is made." *Id.*

In *Lockheed Martin*, 210 F.3d at 1378, the Government also argued that the "Patent Rights Clause—Retention by the Contractor" restricts the taxpayer's rights to research. The clause gives the taxpayer "rights to all patents and inventions, subject to the government's right

**[\*59]** to a nonexclusive, nontransferable, paid-up license." *Id.* The Federal Circuit considered the Government's argument and determined that this clause and the "Rights in Technical Data and Computer Software" clause gave the Government broad rights but not unlimited rights since the taxpayer was not restricted from using the information itself or disclosing it to others. *Id.* The court determined the taxpayer was restricted on its obligation to reimburse the Government only when it wished to sell or license the information when "the information constitutes a contract item, an 'essentially similar item' or 'related technology.'" *Id.* The Federal Circuit explained that "[t]he fact that others may have access to the data and software does not mean that Lockheed Martin loses its rights therein. The right to use is not a zero-sum game. Lockheed Martin still retains substantial rights in the subject matter even when others do as well." *Id.*

In conclusion, the Federal Circuit ruled in *Lockheed Martin*, 210 F.3d at 1378–79, that under the provisions of the contract it was not funded since the taxpayer had "retained the right to use the results of its research in its business without paying for that right and therefore retained 'substantial rights' in its research under Treasury Reg. §§ 1.41-2(a) and 1.41-5(d)."

Here respondent contends on the basis of the plain terms of the Projects' contracts that AS+GG did not retain substantial rights in the research performed. Petitioners contend—after looking in totality at the Projects' contracts, settlement agreements, and foreign law—that AS+GG did retain substantial rights in its research. To decide the issue, we will once again examine the terms of the contract for each Project and determine whether there was a retention of substantial rights. *See id.* at 1376; *Tangel*, T.C. Memo. 2021-1, at \*17 ("[T]he parties' agreement controls in determining whether the taxpayer performing the research has retained 'substantial rights.'").

1.  *Atrium City Tower (Project No. 208021)*

The Atrium City Tower Contract section 6.1(b) and (d), Information, Documents, and Confidentiality, provided that if there was a termination during the concept design phase, "[AS+GG] shall retain the intellectual property"; but if there was any termination beyond the concept design phase which included full payment for the phases along with the mobilization fee, "the ownership of the intellectual property will vest automatically with [Meraas] . . . [and AS+GG] shall have a limited license to display, present, exhibit and state the design." Section 6.1(g)

**[\*60]** provided that Meraas shall not replicate the same project without remuneration to AS+GG for "25% of the original design fee." If AS+GG wanted to use the information for educational purposes to advance the knowledge of the architectural profession, section 6.1(h) provided that the consent of Meraas needed to be obtained. Finally, section 6.2(a), Confidentiality, provided that AS+GG shall not use any information from Atrium City Tower for any purpose other than the performance under the contract "without having first obtained on each occasion the express prior written approval of [Meraas]."

We conclude the Atrium City Tower Contract terms are unambiguous. However, we determine section 6.1 inapplicable given that neither party clearly indicates at what phase the project was terminated, Meraas is not trying to replicate the construction of the project, and AS+GG is not trying to use the work only for publication to advance the general knowledge of the architectural profession.

The clause that directly addresses the issue of whether AS+GG retained substantial rights is found in section 6.2(a). Without having obtained on each occasion express prior written approval from Meraas, AS+GG was prohibited from using "any information, article, press release, drawing, photograph, illustration or any other publicity relating to this Agreement or the Project generally or use such information for any purpose other than performing the Services." This clause aligns with the contract in *Dynetics*, which determined that the taxpayer did not retain substantial rights in the results of the research since it first needed the Government's authorization to use those results. *Dynetics*, 121 Fed. Cl. at 521; *see also Tangel*, T.C. Memo. 2021-1, at \*17 ("Having to secure permission to use the research, with no conditions limiting the other party's ability to withhold consent, prevents [the taxpayer] from possessing substantial rights.").

However, as previously discussed, settlement agreements are taken into consideration when the terms directly override the original terms. Section 6.2(a) of the Atrium City Tower Contract is superseded by the Deed of Settlement by section 3.2(d)(ii), where the parties mutually agreed that "ASGG retains the copyright in the Projects Documents and hereby grants Meraas a license to market the Projects Documents and Projects on condition that ASGG's name is legibly on all images/models/videos of the Projects."

Here, AS+GG retained the copyright to the project documents and gave Meraas a license to market the documents. Meraas's license,

**[\*61]** however, does not restrict AS+GG from using any information from the research in the future. "The right to use the research results, even without the exclusive right, is a substantial right." *Lockheed Martin*, 210 F.3d at 1375. Consequently, we determine AS+GG has retained substantial rights to the research performed under the Atrium City Tower Contract, as amended through the Deed of Settlement.

## 2. *Kingdom Tower (Project No. 210005)*

The Kingdom Tower Contract provides under Information, Documents and Confidentiality, section 6.1(b) and (c), that if Jeddah fulfilled its obligations of remuneration at various points of the contract, "all information, data, drawings and documents developed or prepared by [AS+GG] in the performance of the Services shall forthwith become the absolute property of [Jeddah]"; and other than designs previously used on other projects by AS+GG "the copyright in relation to all information, data, drawings and documents developed or prepared by [AS+GG] in the performance of the Services shall forthwith vest in [Jeddah] and [AS+GG] shall not use them for any purpose other than for the performance of the Services."

Finally, section 6.2, Confidentiality, provided that AS+GG shall not use any information for any use other than performing the contract "without having first obtained on each occasion the express prior written approval of [Jeddah]."

The Kingdom Tower Contract terms are unambiguous. Under section 6.1(b) and (c) all documents, information, and the copyright in relation to the information prepared are to become the absolute property of Jeddah. These clauses prevent AS+GG from obtaining any ownership or control over the information and documents developed in respect to the Kingdom Tower Contract. Further, the clauses explicitly preclude AS+GG from using the information obtained. Section 6.2 provided that AS+GG is required to obtain express written approval from Jeddah for using the information acquired other than in performing the services under the Kingdom Tower Contract. *See Dynetics*, 121 Fed. Cl. at 521 (determining the taxpayer did not retain substantial rights in its research and failed to address "the obvious question of how it could have substantial rights in the results of the research, if it needed the government's 'authorization' to use those results").

Petitioners argue that various sections of the Copyright Laws of the Kingdom of Saudi Arabia regarding moral rights apply to the

**[\*62]** Kingdom Tower Contract. Generally Copyright Laws of the Kingdom of Saudi Arabia provided that moral rights include attributing work to oneself, objecting to any infringement of work, and preventing deletion, amendments, and withdrawal of work. These moral rights are permanent rights of the author and are not subject to waiver or lapse by prescription. Petitioners, without explaining how the foreign law would apply, contend that these laws override the terms of the Kingdom Tower Contract and give rise to AS+GG's retaining its copyright. We remain unpersuaded.

First, petitioners do not explain through caselaw or testimony how this statute would override the Kingdom Tower Contract that was assented to by both parties.[24] Second, petitioners fail to explain what moral rights encompass. Third, if this law generally applies to all architecture contracts in the Kingdom of Saudi Arabia for the production of any work at any stage and cannot be "subject to waiver or lapse by prescription," then there was no purpose in contracting to Information, Documents and Confidentiality in section 6 of the Kingdom Tower Contract. Fourth, the determination of substantial rights must be made by reference to the research agreements, not by reference to information, including foreign law, outside the agreement. *See Lockheed Martin*, 210 F.3d at 1375–76.

In conclusion, AS+GG did not retain substantial rights in the research performed under the Kingdom Tower Contract.

### 3. *Masdar HQ (Project No. 208004)*

Section 10.1, Intellectual Property, provided that "Masdar acknowledges that the Documents are vested, and shall remain vested, in [AS+GG] or Sub-Consultants as appropriate." AS+GG agreed under section 10.2 and 10.3 to grant "a worldwide, irrevocable royalty-free exclusive license(s) to Masdar to copy, use and to reproduce any or all of the Documents for any purpose connected with the Project." Section 10.4 provided that although the intellectual property remained vested in AS+GG, it was not entitled to "use the Documents so as to design any building or structure similar in overall design and appearance to Masdar city, nor shall it be entitled to use the Documents for any purpose connected with Masdar city other than for the purpose of this Agreement" without prior written consent of Masdar. Documents were

---

[24] As seen in *Betz*, T.C. Memo. 2023-84, at \*110–11, the Court relied on the prior holdings of the courts in the jurisdiction of the choice-of-law provision to analyze the contract terms.

[*63] defined broadly to mean "all drawings, models, plans, elevations, sections, perspectives, specifications, schedules, designs and any other works and documentation produced as part of the services."

Again, the terms of the Masdar HQ Contract are unambiguous. The documents and intellectual property rights, which include the models, plans, and drawings, are vested in AS+GG. The license that is granted to Masdar under section 10.2 and 10.3 does not diminish AS+GG's right to use the results of the research. *See Lockheed Martin*, 210 F.3d at 1375 ("The right to use the research results, even without the exclusive right, is a substantial right.").

The limiting clause of section 10.4 does generally restrict AS+GG's overall rights in utilizing the documents to produce another building structure that is "similar in overall design and appearance to Masdar City" without written consent of Masdar. However, we do not find this clause changes the rights obtained by AS+GG. Put simply, this clause does not exclude AS+GG from designing another building that has innovative functional technology developed from its research under the Masdar HQ Contract as long as the structure of the building as a whole is not similar in overall design and appearance to Masdar HQ. *See id.* at 1377; *Betz*, T.C. Memo. 2023-84, at *111.

The Masdar Settlement Agreement entered into between the parties provided that they "acknowledge Masdar's perpetual license and right to use the Intellectual Property pursuant to Clause 10.2 of the Consultancy Agreement." It further provided that "[f]or avoidance of doubt, the Agreement remains in full force and effect subject to the terms of this Settlement Agreement and any amendments or variations to the Agreement." There are no terms in the Masdar Settlement Agreement that contradict the original terms in the Masdar HQ Contract such that further analysis is needed.

Therefore, we determine AS+GG has retained substantial rights to its research under the Masdar HQ Contract, as amended.

4.     *Atrium City Masterplan (Project No. 207014)*

The Copyright section provided that "AS+GG shall retain the copyright of their work and upon payment of all fees when due shall grant the Client a license to reproduce the work in connection with the completion of the Project." However, the Copyright section provided that if "AS+GG's services do not proceed past Concept Design or should the client hire another architect to complete the Project past Concept Design

**[*64]** AS+GG shall retain the ownership and copyright of all work produced and the Client may not use AS+GG documents for the Project."

We find the Atrium City Masterplan Contract terms to be unambiguous. AS+GG retained copyrights of its work, which would allow it to use its research in future projects. The license to Meraas does not divest AS+GG of its ability to use its own research. *See Lockheed Martin*, 210 F.3d at 1378 ("The right to use is not a zero-sum game. [The taxpayer] still retains substantial rights in the subject matter even when others do as well."). Consequently, we determine AS+GG has retained substantial rights under the original terms of the Atrium City Masterplan Contract.

We are to also consider the terms under the Deed of Settlement that directly override the terms of the Atrium City Masterplan Contact. The Deed of Settlement section 3.2(d)(ii) provided that "ASGG retains the copyright in the Projects Documents and hereby grants Meraas a license to market the Projects Documents and Projects on condition that ASGG's name is legibly on all images/models/videos of the Projects."

After considering the Deed of Settlement, our determination remains unchanged. AS+GG retained copyrights in the documents and granted Meraas a license to market the documents. The license is not an unlimited restriction prohibiting AS+GG from using any information or its research in the future. *See id.* at 1375. Accordingly, AS+GG has retained substantial rights in the research performed under the Atrium City Masterplan Contract, as amended.

5.     *Plot 14 (Project No. 206003)*

Section 6.1(b), Information, Documents and Confidentiality, provided that "[a]ll information, data, drawings and documents developed or prepared by [AS+GG] in the performance of the Services shall forthwith become the absolute property of [Emaar Properties]." Further, section 6.1(c) provided that other than designs used on other projects by AS+GG, "the copyright in relation to all information, data, drawings and documents developed or prepared by [AS+GG] in the performance of the Services shall forthwith vest in [Emaar Properties] and [AS+GG] shall not use them for any purpose other than for the performance of the Services." Finally, section 6.2, Confidentiality, provided that AS+GG could not use any of the information obtained from the project other than in performing the services "without having first

**[*65]** obtained on each occasion the express prior written approval of [Emaar Properties].”

We find the Plot 14 Contract terms to be unambiguous. All documents were the absolute property of Emaar Properties, and the copyright as to all information, data, drawings and documents was vested in Emaar Properties as stated under section 6.1(b) and (c). The Plot 14 Contract also specifically mentioned under section 6.2 that AS+GG had to obtain written permission from Emaar Properties to use any of the information other than for the performance of the services for the Plot 14 Contract. *See Tangel*, T.C. Memo. 2021-1, at *17 (“Having to secure permission to use the research, with no conditions limiting the other party’s ability to withhold consent, prevents [the taxpayer] from possessing substantial rights.”); *Betz*, T.C. Memo. 2023-84, at *109 (“If [the taxpayer] was unable to retain and use such information, material, and work product without permission, then we fail to see what rights [the taxpayer] retained under the contract to any research performed, aside from the incidental benefit of increased knowledge and experience.”); *Dynetics*, 121 Fed. Cl. at 521 (ruling that the taxpayer did not retain substantial rights in the results of the research when it needed Government “authorization” to use the results). Accordingly, AS+GG failed to retain substantial rights to its research in the Plot 14 Contract.

The email correspondence petitioners cite regarding settlement of the project does not address copyright or document rights under the Plot 14 Contract; therefore, no further analysis is required.

Petitioners argue that U.A.E. copyright provisions providing automatic protection to authors should apply to the Plot 14 Contract. We do not agree with petitioners. “The regulation’s focus on the taxpayer’s right under the research agreements make[s] it clear that the determination whether the taxpayer had the right to use the results of its research without paying for that right must be determined by reference to the research agreements.” *Lockheed Martin*, 210 F.3d at 1376; *see Tangel*, T.C. Memo. 2021-1, at *17 (“[T]he parties’ agreement controls in determining whether the taxpayer performing the research has retained ‘substantial rights.’”).

Petitioners provide no testimony or caselaw on how or why these U.A.E. copyright protection laws would override the agreed-to contract terms. Petitioners cite the U.A.E. Ministry of Information and Culture, which affords an author protection without the need for formal

**[\*66]** registration when the work is created. Yet this foreign law petitioners cite also mentions that the author is the owner of all the rights except what he disposes of openly and that the author and his successors or the holder of the right of the author can grant a license for exploitation of the work by any means. Consequently, we find this foreign law inapplicable in our determination of whether substantial rights to the research were retained by AS+GG.[25]

We find that AS+GG did not retain substantial rights to its research under the Plot 14 Contract.

### 6. *Plot R2 (Project No. 207016)*

Section 6.1, Information, Documents and Confidentiality, provided that "[AS+GG] shall retain the copyright of their work and upon payment of all fees when due shall grant [ETA Star Property] a license to reproduce the work in connection with the completion of the Project"; but "[s]hould [AS+GG]'s services not proceed past Concept Design or should [ETA Star Property] hire another architect to complete the Project past Concept Design [AS+GG] shall retain the ownership and copyright of all work produced."

The Plot R2 Contract terms are unambiguous, and petitioners' arguments here are compelling. AS+GG retained the copyright of its work, which allowed it to use the results of its research. Even if ETA Star Property was granted a license, its right to use the research results does not preclude AS+GG's right to also use the research results. *See Lockheed Martin*, 210 F.3d at 1375.

Accordingly, we find that AS+GG did retain substantial rights in its research under the Plot R2 Contract.

### C. *Conclusions as to Funded Research*

In conclusion, none of the payments under the six contracts were contingent on the success of the research. However, under four of the six contracts AS+GG did retain substantial rights—Atrium City Tower, Masdar HQ, Atrium City Masterplan, and Plot R2. Consequently, for the four Projects for which AS+GG did retain substantial rights, petitioners may be eligible to claim research credits, to the extent the

---

[25] Even if we were to apply the U.A.E. law referenced, these automatic protections afforded under the law would have been legally contracted away when AS+GG agreed to do so under the contracts.

**[\*67]** total amount of the research expenses exceeded the payments received. *See* Treas. Reg. § 1.41-4A(d)(3), (6) (ex. 1).

V. *Reasonable Compensation*

The parties disagree about the methodology to be used for measuring or determining reasonable compensation of the Partners. Petitioners argue that the test for determining reasonableness is the independent investor test as dictated by the Seventh Circuit in *Exacto Spring Corp. v. Commissioner,* 196 F.3d 833, 838 (7th Cir. 1999), *rev'g Heitz v. Commissioner*, T.C. Memo. 1998-220. Respondent contends that the independent investor test is not the applicable test in these cases because it relates to section 162 and not specifically to section 174. Respondent instead argues that the factors set out in *Mayson Manufacturing Co. v. Commissioner*, 178 F.2d at 119, and considered in *Suder*, T.C. Memo. 2014-201, at \*64, should apply.

Congress added section 174(e) to the Code in the Omnibus Budget Reconciliation Act of 1989 (OBRA), Pub. L. No. 101-239, § 7110(d), 103 Stat. 2106, 2325. The House report accompanying OBRA, H.R. Rep. No. 101-247, at 1203 n.12 (1989), *as reprinted in* 1989 U.S.C.C.A.N. 1906, 2673 n.57, explains:

> The committee intends that the reasonableness requirement under section 174 be parallel to the reasonable allowance requirement for salaries and other compensation under section 162(a)(1), in that amounts supposedly paid for research may be recharacterized as disguised dividends, gifts, loans, or other similar payments. The committee does not intend that the reasonableness requirement under section 174 be used to question whether or not research activities themselves are of a reasonable type or nature.

Under section 174(e) a taxpayer may deduct a research and development expenditure to the extent that "the amount thereof is reasonable under the circumstances."[26] Under section 162(a)(1) a taxpayer may deduct "a reasonable allowance for salaries or other compensation for personal services actually rendered." "The test of deductibility in the case of compensation payments is whether they are

---

[26] On the basis of the amendment to section 174, adding subsection (e), we find Congress has legislatively overruled the district court's conclusions reached in *Driggs v. United States*, 706 F. Supp. 20 (N.D. Tex. 1989).

**[\*68]** reasonable and are in fact payments purely for services." Treas. Reg. § 1.162-7(a); *see id.* para. (b)(3).

The Seventh Circuit, in *Exacto Spring Corp. v. Commissioner*, 196 F.3d at 839, has held that to determine whether payments of compensation are reasonable, an "independent investor" test should be applied. *See also Menard, Inc. v. Commissioner*, 560 F.3d 620, 623 (7th Cir. 2009), *rev'g* T.C. Memo. 2004-207. The parties have stipulated that appeal of these cases will be to the Seventh Circuit. *See* I.R.C. § 7482(b)(1) and (2). We follow the law of the court of appeals to which an appeal will lie. *Golsen v. Commissioner*, 54 T.C. 742, 757 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971). Accordingly, the Seventh Circuit has expressly told us that the independent investor test is the standard we are to use for determining reasonable compensation. *Exacto Spring Corp. v. Commissioner*, 196 F.3d at 838.[27] Thus, we will faithfully apply the independent investor test set forth by the Seventh Circuit in *Exacto Spring Corp.*

The independent investor test creates a rebuttable presumption that an owner-employee's salary is reasonable if investors obtain a "far higher return than they had any reason to expect." *Id.* at 839. The test's rationale is that investors pay managers salaries to "work[] to increase the value of the assets . . . entrusted to [their] management." *Id.* at 838.

> The higher the rate of return (adjusted for risk) that a manager can generate, the greater the salary he can command. If the rate of return is extremely high, it will be difficult to prove that the manager is being overpaid, for it will be implausible that if he quit if his salary was cut, and he was replaced by a lower-paid manager, the owner would be better off; it would be killing the goose that lays the golden egg.

*Id.* Thus, if investors obtain returns above what they should reasonably expect, a manager's salary is presumptively reasonable. *Id.* at 839. The presumption is rebutted if the high rate of return is attributable to an extraneous event rather than the manager's efforts. *Id.*

---

[27] Respondent cites *Suder*, T.C. Memo. 2014-201, at \*63, and contends that the Court now applies the multifactor test described in *Mayson*. Respondent, however, ignores the fact that the so-called *Mayson* multifactors were applied because the case was appealable to the U.S. Court of Appeals for the Fifth Circuit. *See id.* at \*63–64.

[*69] The parties do not dispute that if the independent investor test was applied, the mathematical results would support the Partners' total compensation as reasonable. Given that we have concluded that the independent investor test does apply in these cases, we further conclude that the Partners' compensation claimed for 2008, in total, is reasonable under section 174(e).

VI.    *Conclusion*

Having determined that none of the payments under the six contracts were contingent on the success of the research, but for four of the six contracts AS+GG did retain substantial rights—Atrium City Tower, Masdar HQ, Atrium City Masterplan, and Plot R2—we hold that petitioners may claim partial research credits subject to Treasury Regulation § 1.41-4A(d)(3). Given that petitioners may claim partial research credits under Treasury Regulation § 1.41-4A(d)(3), we further hold that the Partners' compensation claimed for 2008, in total, is reasonable under section 174(e). However, we are unable to determine the precise amounts of these partial credits (if any) since there is insufficient evidence before us to decide the issue.

As agreed under the terms of the Stipulation of Settled Issues filed by the parties on August 2, 2019, our findings herein as to the agreed-to "6 Sample Projects" "will be projected on a pro rata basis" by the parties as to AS+GG's remaining projects. Accordingly, we will leave this pro rata basis calculation to be determined by the parties. Should the parties be unable to reach an agreement as to the remaining 42 projects not addressed in this report, the Court will entertain a request for additional briefing or further trial proceedings (if necessary) on the issue.

In reaching our decisions we have considered all arguments made by the parties, and to the extent not mentioned or addressed, they are irrelevant, moot or without merit.

To reflect the foregoing,

*An appropriate order will be issued.*